## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

| | |
|---|---|
| **S. M. LEVINE**, Individually and Derivatively on Behalf of **THE DOW CHEMICAL COMPANY,**<br><br>Plaintiff,<br><br>v.<br><br>**ANDREW N. LIVERIS; CHARLES J. KALIL; ARNOLD A. ALLEMANG; JOHN B. HESS; AJAY BANGA; JACQUELINE K. BARTON; JAMES A. BELL; RICHARD K. DAVIS; GEOFFREY E. MERSZEI, JEFF M. FETTIG; MARK LOUGHRIDGE; RAYMOND J. MILCHOVICH; ROBERT S. MILLER; PAUL POLMAN; DENNIS H. REILLEY; JAMES M. RINGLER; HOWARD I. UNGERLEIDER, RUTH G. SHAW AND JEFFREY L. TATE**,<br><br>Defendants,<br><br>- and -<br><br>**THE DOW CHEMICAL COMPANY,**<br><br>Nominal Defendant. | **Case No. 16-CV-11255-TLL-PTM** |

## CORRECTED AMENDED COMPLAINT

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought by Plaintiff on behalf of Nominal Defendant, The Dow Chemical Company ("Dow" or the "Company"), against certain current and former officers and directors (the "Individual Defendants") of the Company for breaches of their fiduciary duties, the failure of their stewardship of the Company more generally and waste of the Company's assets during their respective tenures as officers and/or directors thereof. These claims are alleged derivatively because Dow's Board of Directors, despite repeated written pre-suit demands, has not caused the Company to pursue such claims directly. Such demands have either been wrongfully rejected outright or, in the case of certain demands relating to Defendant Andrew N. Liveris, Dow's Chairman and Chief Executive Officer, they have been constructively rejected.

2.     Such conduct by the Individual Defendants, aided and abetted by Dow's purportedly independent auditor and legal counsel, resulted in, *inter alia*, the Company's direct and indirect participation in and/or "cover-up" of Dow's systemic violations of the federal antitrust laws and direct and indirect participation in a conspiracy to fix, raise and/or stabilize prices for urethane chemicals over at least a six-year period, as alleged and now proven in *In Re: Urethane Antitrust Litigation*, MDL. No. 1616, Civil Action No. 04-1616 (D. Kan.), also referred to as the polyether and polyol cases ("*Urethane Litigation*"). Such litigation resulted in a

final judgment on behalf of a Class of purchasers of such products against Dow for more than $1.2 billion, which judgment has been upheld on appeal and thereafter provisionally settled for $835 million, subject to notice and approval by the Court.[1] Dow also paid approximately an additional $450 million to settle individual claims from purchasers of the affected products who had excluded themselves from membership in the Class.

3.    During and prior to the pendency of the *Urethane Litigation* described herein, Dow's Board and knowledgeable senior officers, out of misguided loyalty to Defendant Liveris,   conspired to acquiesce in and "cover up" massive, unjustified, multi-year misuse of Dow's assets by him.[2] Despite specific knowledge that came to the attention of all members of the Board at least following the commencement of a Sarbares-Oxley Act "whistleblower" suit, *Wood v. The Dow Chemical Co, et al.,* C.A. No. 14-13049 (E.D. MI.), (the "*Wood* suit"

---

[1] Dow petitioned the Supreme Court for *certiorari* during the 2014-5 term. The Petition had been deferred for consideration during the Supreme Court's current term. The Company never disclosed its total exposure to non-Class member claims arising from the price-fixing conspiracy. On or after February 25, 2016, Dow requested that the Supreme Court defer consideration of the Company's Petition for Certiorari pending consummation of the $835 million settlement with the Class. The proposed settlement of this case was preliminarily approved by the Court subject to a final approval hearing scheduled in July

[2] Although Defendant Liveris has repaid Dow a portion of the assets he misused in breach of the Individual Defendants' duty of candor owed to Dow and its shareholders, there has been no public record of the full amount thereof or, upon information and belief, any complete accounting thereof.

referred to below), as well as privately and publicly voiced complaints brought to their attention by at least one of Dow's largest institutional shareholders, in deference to Defendant Liveris, such Board members sat idly by. The Board, despite specific knowledge of at least some of his wrongdoing, the Board did not force him to make a public and detailed accounting of his misuse of Dow's assets or require him to repay the Company fully therefor as well as for its expenses, *inter alia*, in defending the *Wood* suit. The Complaint and Ms. Wood's response to defendants' motion to dismiss are attached hereto as Exhibits 1 and 2, the substantive facts alleged therein being hereby being incorporated by reference.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over each of the Defendants pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a)(2) as Plaintiff, on the one hand, and all the Defendants on the other, are citizens of different states, and the value of the relief requested exceeds $75,000, exclusive of interest and costs.

5.    Venue is proper in this District because Dow is physically located within this District and because much of the wrongful conduct took place within this District or originated with directives from Dow's senior management and/or Board from within this District.

6.    This Court has *in personam* jurisdiction over the Individual Defendants named in this action because each of such Defendants, as senior

officers and/or directors of the Company, directly or indirectly conduct business in this District and performed acts in furtherance of the claims asserted in this Complaint in this District.

7.    This action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.  The pre-suit written demands upon Dow's Board were also made pursuant to Rule 23.1. This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

## PARTIES

8.    Plaintiff S.M. Levine is and has been Dow shareholder continuously and at all relevant times referenced herein.  Plaintiff is a citizen of Florida.

9.    Nominal Defendant Dow is a corporation organized under the laws of the State of Delaware, with a principal place of business located in Midland, Michigan.  Dow is a diversified chemical company engaged in the manufacture and sale of chemicals, plastic materials, and agricultural and other specialized products and services. No claims are made herein against Dow.

## DIRECTOR DEFENDANTS

10.    Each of the Director Defendants was a director of Dow at the time of the price-fixing conspiracy referred to herein and/or became a director thereafter but nevertheless acquiesced and/or actively participated in the Board's bad faith conduct with respect to Plaintiff's pre-suit demands upon the Board as described

below.[3] As guided by a Delaware lawyer, Kenneth Nachbar, Esquire, and his firm, the Board and its Governance Committee participated in sham investigations and related proceedings pursuant to which the Board took no action to recover the Company's damages either unilaterally or in response to Plaintiff's pre-suit demands as described more fully below.

11.     Defendant Liveris had and has complete hegemony over the Company and fellow directors and has been, at all relevant times, President, Chief Executive Officer, Chief Operating Officer, and Chairman of the Board of Directors of Dow, as well as serving as Chairman of the Executive Committee of the Company. Previously, Defendant Liveris also served as President and Chief Operating Officer of the Company (2003-2004), President and CEO (2004 to present) and Chairman of Dow (2006 to present).  He is sued herein in his capacity as both an officer and director of Dow. In connection with his planned voluntary retirement from Dow, Defendant Liveris is scheduled to receive approximately $53 million in cash, stock and tax reimbursement payments as a "golden parachute" following the Company's planned merger with The DuPont Company. Under penalty of being replaced on Dow's Board and being denied substantial compensation in connection

---

[3] For the purpose of these demands made pursuant to Rule 23.1, Fed. R. Civ. P., Plaintiff conceded the Board's independence in giving the Board the first opportunity to cause Dow to commence the demanded litigation. Plaintiff never conceded such independence for all purposes or upon an indefinite time.

therewith, Defendant Liveris demands and has demanded, *de facto*, fealty and loyalty to him personally from all of the Director Defendants as well as all employees of the Company.

12.     Defendant Jacqueline K. Barton ("Barton") is, and at relevant times has been, a member of Dow's Board of Directors since 1993 and a member of the Compensation Committee of the Board. In such position, she has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. During a substantial part of her tenure as a Director of Dow, Defendant Barton devoted practically all her available working time to fulfilling her duties as Professor of Chemistry and Department Chair at the California Institute of Technology as well as serving in other positions unrelated to Dow. As a result, notwithstanding her very substantial responsibilities to Dow and its shareholders, she carried out these responsibilities in a perfunctory manner, particularly when she served as a member of the Board's Compensation Committee. She is a citizen of California.

13.     Defendant James A. Bell ("Bell") is, and at relevant times has been since 2005, a member of Dow's Board of Directors and the Chairman of its Audit Committee and member of its Governance Committee. Although as a member of the Governance Committee, Defendant Bell was charged with investigating Plaintiff's pre-suit demands on the Board, he and other members of such

Committee abdicated their responsibilities to Dow by, *inter alia*, delegating such investigations to biased and non-objective counsel to the Governance Committee and acquiescing in the wrongdoing purportedly being investigated by such Committee. During a substantial part of his tenure as a Director of Dow, Defendant Bell devoted practically all his available working time to fulfilling his duties as Executive Vice President, Group President and Chief Financial Officer of The Boeing Company as well as serving in other positions unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Governance Committee and as Chairman of the Audit Committee, both of which required substantial investments of time and diligence, he carried out these responsibilities in a perfunctory manner. Although as a member of the Governance Committee, he was charged with investigating Plaintiff's pre-suit demands on the Board, he and other members of such Committee abdicated their responsibilities to Dow by, *inter alia*, delegating such investigations to biased and non-objective counsel to the Committee and acquiescing in the wrongdoing purportedly being investigated. Defendant Bell joined Dow's Board after the price fixing conspiracy ended but prior to the commencement of the *Urethane Litigation* and has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands and Defendant Liveris' misuse of Dow's assets. He is believed to be a citizen of Illinois.

14.     Defendant Jeff M. Fettig ("Fettig") is, and at all relevant times has been, a member of Dow's Board of Directors, since 2003, and Lead Director since May, 2011.  He currently serves as Chairman of the Governance Committee and is a member of the Compensation Committee.  Defendant Fettig devotes practically all his available working time to fulfilling his duties as Chairman and Chief Executive Officer of Whirlpool Corporation as well as serving in other positions unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as Lead Director, Chair of the Governance Committee and as a member of the Compensation Committee, all of which required substantial investments of time and diligence, he carries out these responsibilities in a perfunctory manner.  Although as a member of the Governance Committee, he was charged with investigating Plaintiff's pre-suit demands on the Board, he and other members of such Committee abdicated their responsibilities to Dow by, *inter alia*, delegating such investigations to biased and non-objective counsel to the Committee and acquiescing in the wrongdoing purportedly being investigated.  As a member of the Compensation Committee of the Board, in such position, Defendant Fettig has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct.  He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is a citizen of Michigan.

15.     Defendant Ruth G. Shaw ("Shaw") is, and at all relevant times has been a member of Dow's Board of Directors, since 2005, and a member of the Compensation Committee. In such position, she has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. Defendant Shaw devotes practically all her available working time to fulfilling her duties as a senior executive of Duke Nuclear as well as serving in other positions unrelated to Dow. As a result, notwithstanding her very substantial responsibilities to Dow and its shareholders, she has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. She is believed to be a citizen of North Carolina.

16.     Defendant Dennis H. Reilley ("Reilley") is, and at all relevant times has been, a member of Dow's Board of Directors, since 2007, and is the Chair of the Compensation Committee and a member of the Governance Committee. Defendant Reilly devotes practically all his available working time to fulfilling his duties as Chairman of Marathon Oil Corporation as well as serving in other positions unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as Chair of the Compensation Committee and as a member of the Governance Committee, Defendant Reilley carries out these responsibilities in a perfunctory manner.   In serving on the Compensation Committee, Defendant Reilly has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. Although as a

member of the Governance Committee, he was charged with investigating Plaintiff's pre-suit demands on the Board, he and other members of such Committee abdicated their responsibility to Dow by, *inter alia,* delegating such investigations to biased and non-objective counsel to the Committee and acquiescing in the wrongdoing purportedly being investigated. Defendant Reilley joined Dow's Board after the price fixing conspiracy ended but prior to the commencement of the *Urethane Litigation* and has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of Connecticut.

17.     Defendant Geoffrey E. Merszei ("Merszei") served as Executive Vice President of the Company from July, 2005 until August, 2012.  He served as a member of Dow's Board of Directors, as well as the Company's Chief Financial Officer, from 2005 through 2009.  He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He reported to Defendant Liveris and followed his orders. He is believed to be a citizen of Michigan.

18.     Defendant Raymond J. Milchovich has been a director of Dow since 2015 and is a member of its Compensation Committee. Defendant Milchovich joined Dow's Board after the price fixing conspiracy ended but during the pendency of *Urethane Litigation* and has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands.  Defendant Milchovich devotes a very

significant portion of his available working time to fulfilling his duties as Lead Director of Nucor Corporation as well as serving in other positions unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Board and its Compensation Committee, Defendant Milchovich carries out these responsibilities in a perfunctory manner. In serving on the Compensation Committee, Defendant Milchovich has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. He is believed to be a citizen of a state other than Florida.

19.    Defendant Robert S. "Steve" Miller has been a director of Dow since 2015. Defendant Miller joined Dow's Board after the price fixing conspiracy ended but during the pendency of the *Urethane Litigation*. Defendant Miller devotes substantially all of his available working time to fulfilling his duties as President and Chief Executive Officer of International Automotive Components Group, as well as serving in other positions unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Board, its Governance Committee and another Committee of the Board, he carries out these responsibilities in a perfunctory manner. He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of a state other than Florida.

20.     Defendant Mark Loughridge has been a director of Dow since 2015, as well as a member of its Audit Committee. Defendant Loughridge joined Dow's Board after the price fixing conspiracy ended but during the pendency of the *Urethane Litigation*. Although he has now left his position with IBM Corporation, he devotes the bulk of his available working time to various business, investment and other activities unrelated to Dow. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Board and its Audit Committee, he carries out these responsibilities in a perfunctory manner. He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of a state other than Florida.

21.     Defendant James M. Ringler ("Ringler") has been a director of Dow since 2001 and is a member of the Board's Audit Committee. Defendant Ringler joined Dow's Board during and after the price fixing conspiracy ended and during the pendency of  the *Urethane Litigation and* has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. Defendant Ringler devotes substantially all of his available working time to fulfilling his duties as Chairman of Teradata Corporation, as well as serving in other positions unrelated to Dow. He is believed to be a citizen of a state other than Florida.

22.     Defendant John B. Hess ("Hess") served at relevant times as a member of Dow's Board of Directors, since 2006, and as a member of the

Compensation Committee. In such positions, he has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. During his tenure as a member of the Board, Defendant Hess devoted practically all his available working time to fulfilling his duties as Chairman and Chief Executive Officer of Hess Corporation. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member both of the Board and its Compensation Committee, Defendant Hess carried out these responsibilities in a perfunctory manner. He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of New Jersey.

23. Defendant Ajay Banga ("Banga") has been a member of the Board since 2013 as well as a member of its Compensation Committee. In such position, he has personally acquiesced in Defendant Liveris' misuse of Dow's assets and related misconduct. During his tenure as a member of the Board, Defendant Banga has devoted practically all his available working time to fulfilling his duties as Chairman and Chief Executive Officer of MasterCard Corporation. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member both of the Board and its Compensation Committee, Defendant Banga carried out these responsibilities in a perfunctory manner. He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of a state other than Florida.

14

24.     Defendant Paul Polman ("Polman") has been a member of the Board since 2010. During his tenure as a member of the Board, Defendant Polman has devoted practically all his available working time to fulfilling his duties as Chief Executive Officer of Unilever, plc and Unilever N.V. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Board, Defendant Polman carried out these responsibilities in a perfunctory manner. He has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of a state other than Florida.

25.     Defendant Richard K. Davis ("Davis") has been a member of the Board since 2015. During his tenure as a member of the Board, Defendant Davis has devoted practically all his available working time to fulfilling his duties as Chairman and Chief Executive Officer of U.S. Bancorp. As a result, notwithstanding his very substantial responsibilities to Dow and its shareholders as a member of the Board and its Audit Committee, Defendant Davis carried out these responsibilities in a perfunctory manner. Defendant Davis joined Dow's Board after the price fixing conspiracy ended but during the pendency of the *Urethane Litigation* and has acquiesced in the Board's inaction with respect to Plaintiff's pre-suit demands. He is believed to be a citizen of a state other than Florida.

26.     Defendant Arnold Allemang ("Allemang") had been a member of the Board since 1996. During his tenure as a member of the Board, Defendant Allemang served, *inter alia*, as a Senior Advisor to Defendant Liveris. He is believed to be a citizen of Michigan."

## OFFICER DEFENDANTS

27.     Defendant Charles J. Kalil ("Kalil") served as Executive Vice President and General Counsel of the Company. Defendant Kalil joined Dow in 1980 and has been an Executive Vice President since 2008 and its General Counsel since December 2004. He was named Corporate Secretary in July 2005. Upon information and belief, he was particularly knowledgeable with respect to Dow's participation in the price fixing conspiracy that led to the *Urethane Litigation* and was charged with overseeing its defense including, *inter alia*, the selection of defense counsel and development of litigation strategy. Defendant Kalil actively participated in the concealment of the misuse of Dow's assets by Defendant Liveris, with whom he was a long-time colleague and subordinate. As alleged in the *Wood* suit, Defendant Kalil was also directly involved in coercive activities vis-à-vis Ms. Wood and was instrumental in her wrongful termination as a Dow employee. He is a citizen of Michigan.

28.     Defendant Jeffrey L. Tate ("Tate") served as Dow's Chief Audit Executive (i.e. Corporate Auditor). He has been responsible for assessing the

adequacy of accounting, financial and operating controls of Dow's global operations which, together with Deloitte & Touche, LLP,("Deloitte"), Dow's purportedly independent auditor, knew or should have known were not properly functioning.  Defendant Tate has held this position since December. 2012 and participated in the concealment of the misuse of Dow's assets by Defendant Liveris.  He is believed to be a citizen of Michigan.

29.    Defendant Howard I. Ungerleider ("Ungerleider") served as Dow's Chief Financial Officer.   He is believed to be a citizen of Michigan. Defendant Ungerleider participated in the concealment of the misuse of Dow's assets by Defendant Liveris.

30.    The Dow officers and directors identified immediately above are collectively referred to herein as the "Individual Defendants". Those of the Individual Defendants who serve or served as members of Dow's Board are referred to herein as the "Director Defendants." Each of such Individual Defendants is named herein due to his or her conduct during his or her tenure as a Dow officer and/or director.

31.    As to those of the Director Defendants who joined Dow's Board in 2015, they did so following a deal made between so-called "activist investor," Daniel Loeb (and his company, Third Point) and Defendant Liveris to silence repeated and well-publicized criticism of himself and the entire Dow Board.

Despite their superficial appearance of independence, due to the circumstances thereof, none of them can be considered independent of Defendant Liveris.

32.     Each of the Individual Defendants, collectively and individually, initiated or actively participated in a bad faith course of conduct in breach of their fiduciary duties that was designed to, and did:

a.     Deceive the shareholders of Dow regarding the Individual Defendants' management and oversight of the Company's operations and compliance with applicable antitrust laws and regulations, resulting in a massive judgment against the Company in the *Urethane Litigation*, which has now been settled for $835 million (plus more than $450 million paid to settle claims of non-Class members) and for which Dow has been caused to expend tens of millions of dollars in defense, expert and related expenses;

b.     Waste Dow's assets by means of, *inter alia*, exposing the Company to well in excess of $1 billion in damages in the *Urethane Litigation*, which action could have, and should have, been settled for far less and/or not brought in the first place had adequate internal controls and antitrust compliance procedures been in place to prevent the wrongdoing; failing to preserve by tolling agreements or otherwise, valuable claims belonging to the Company against, *inter alia*, its

outside auditor, Deloitte, Dow's outside legal counsel and others responsible for the Company's damages;

c.   Use or sit idly by while Dow's corporate assets were being used to further the personal interests of Defendant Liveris, including but not limited to defending and settling with Dow funds the "whistleblower" action captioned *Wood v. The Dow Chemical Co, et al.,* C.A. No. 14-13049 (E.D. MI.) and possibly other similar claims not disclosed publicly.

d.   Disregard and/or intentionally breach the Company's Code of Business Conduct, Code of Financial Ethics, its corporate governance guidelines, various Board Committee Charters, as identified herein, as well as other written policies governing their conduct;

e.   Enhance the Individual Defendants' positions as directors and/or officers of Dow while providing each of them with substantial compensation, power, and prestige together with other perquisites of office;

f.   Wrongfully reject and constructively reject the pre-suit written demands made by Plaintiff, all the while failing to preserve, pursue or even legitimately investigate in a *bona fide* manner the substantial claims asserted therein against the Individual Defendants, legal

counsel and others, notwithstanding the validity and value of such claims;

g.   Conceal the fact that the Company was and is improperly misrepresenting and historically had misrepresented Dow's internal controls (including Deloitte's blessing thereof) in order to allow a widespread scheme of wrongful behavior in violation, *inter alia*, of applicable antitrust laws and regulations, corporate waste and the cover-up such wrongdoing;

h.   Place their personal loyalty to Defendant Liveris before their fiduciary obligations to Dow and its shareholders;

i.   Cause counsel to be retained to represent the Board's Governance Committee in an attempt to shield and protect the Individual Defendants from personal liability in connection with the claims alleged herein and in other litigation, notwithstanding the fact that there had been no showing that such retention has been *bona fide* and that the retention was for the purpose of assisting in an independent and disinterested evaluation of the Plaintiff's pre-suit claims;

j.   Waste Dow's assets by means of, *inter alia*, paying substantial amounts for the purported independent and objective "investigation" of Plaintiff's pre-suit written demands to legal counsel and for the

20

expenses of the Governance Committee, none of whose efforts were for the Company's benefit; and

k.   Violate their duties of candor owed to Dow, its stockholders and the public generally by means of, *inter alia*, the issuance and dissemination of: (i) materially false and misleading press releases and other statements made to the public; (ii) materially false and misleading financial statements; (iii) failing to disclose publicly and fully Defendant Liveris' misuse of Dow assets; and (iv) failing to disclose in a timely and adequate manner Dow's known financial exposure as a result of the pendency of the *Urethane* Litigation.

33.   Most of the Director Defendants have served on the Dow Board for many years and, due to the passage of time, have become "cronies" of and obligated to Defendant Liveris to maintain their positions. Similarly, the more recently-appointed directors owe their positions to a deal worked out between Defendant Liveris and a so-called "activist investor," to avoid continued personal criticism of him and his wrongful conduct. These directors, together with the earlier-appointed directors, thereby reaped substantial fees, perquisites and emoluments at Defendant Liveris' pleasure. None of these Directors can be considered independent or disinterested; none is sufficiently removed from the underlying and continuing wrongdoing described herein (or its subsequent cover-

up); and none of them has addressed responsibly and in Dow's sole interest the pre-suit demands made by Plaintiff upon them. Simply put, they have not acted objectively, independently or with disinterestedness.

34.    Each member of the Dow Board, as well as the Company's senior management, during their respective tenures, knew concurrently or during the pendency of the *Urethane Litigation* of the wrongful business practices and course of conduct described herein and had specific knowledge of the mandatory regulatory and legal requirements at issue.   Nevertheless, in the face of such specific knowledge regarding past and ongoing wrongdoing, the Individual Defendants breached their fiduciary duties owed to Dow by failing to implement or maintain adequate internal controls and and antitrust compliance procedures to prevent the continuing and systemic violations of applicable federal antitrust laws and regulations and/or to require the Company's management to do so. Thus, each of them knowingly, recklessly, and/or with gross negligence caused the Company to violate such laws and engage in the alleged wrongdoing in order to generate more Company profits through illegal means. In the case of the Individual Defendants other than Defendant Liveris, they participated and/or acquiesced in such conduct to maintain his favor and keep their positions as directors and senior officers together with all of the substantial personal benefits that inured to them as a result.

35.    The Individual Defendants, during their respective tenures as officers and/or directors, were well-informed about, had sufficient material information available to them and/or actively participated in the wrongdoing alleged herein, all the while concealing such conduct from Dow's shareholders, the investing public and governmental regulators. During their respective tenures in office, each of the Individual Defendants was fully informed directly of and/or fully briefed personally as to the seriousness of the allegations and the potential liability of the Company as a result of the conduct as alleged in the *Urethane Litigation* and/or were informed thereof at or about the time they became directors. Similarly, at least a majority of the Board's members were aware or should have been aware of Defendant Liveris' well-known (within the Company) misuse of Dow's corporate assets and have done nothing to force him to fully repay the Company for its damages or cause it to be disclosed publicly.  They abdicated their respective stewardship responsibilities to the Company by acquiescing and/or actively participating in the wrongdoing alleged herein and by placing their loyalty to Defendant Liveris above their duty of loyalty to Dow and its shareholders.

36.    The members of the Dow Board, each of whom was personally appointed or approved by Defendant Liveris, receive hundreds of thousands of dollars each year in fees and other compensation as well as very liberal

"reimbursement of expenses." In addition, they received stock options potentially worth millions of dollars.

## THE *URETHANE LITIGATION* AND RELATED CONDUCT

37.    At all relevant times, Dow manufactured, sold and shipped substantial quantities of "Polyether Polyol" products in a continuous and uninterrupted flow of interstate commerce in the United States and elsewhere. The term "Polyether Polyol" products, as used herein, means polyether polyols, monomeric or polymeric diphenylmethane diisocyanate ("MDI"), toluene diisocyanate ("TDI"), and polyether polyol systems except any such systems that also contain polyester polyols.

38.    Polyether Polyols are intermediate chemicals used in the manufacture of rigid and flexible foams, among other applications. Polyether Polyols are combined with isocyanates (usually either MDI or TDI) to produce polyurethane polymers. Polyether Polyols constitute approximately 90 percent of the world's polyol use.

39.    MDI is a type of isocyanate used in combination with Polyether Polyols as a raw material for the production of rigid insulation foams and structural foams, among other applications.

40.     TDI is another type of isocyanate used in combination with Polyether Polyols as a raw material for the production of flexible foams for furniture, mattresses, packaging foam, and automobile seating, among other applications.  A Polyether Polyol system is a package comprised of an "A" side (predominantly a Polyether Polyol) and a "B" side (an isocyanate, such as MDI or TDI) that, when mixed together by the purchaser, react to form a polyurethane polymer. Due to their different physical properties and applications, Polyether Polyols and polyester polyols constitute separate and distinct markets. Important characteristics of the MDI, TDI and Polyether Polyols markets are such that facilitated anticompetitive collusion among Dow and its co-conspiritors and promoted successful effects of that collusion; i.e. the inflation of prices above competitive levels.

41.     As the Individual Defendants who held their respective positions with Dow before and during the pendency of the *Urethane Litigation* were aware or should have been aware had they been appropriately diligent, due to both the limited number of common manufacturers and a close correspondence in ownership of production of Polyether Polyol products, the markets for these products are highly concentrated, with Dow and a few other manufacturers controlling 100% of the TDI and MDI markets and more than 75 percent of the Polyether Polyols market more generally.   In addition, as such Individual Defendants knew or should have known, there are high barriers to entry to these

markets due to environmental laws and regulations and the capital-intensive nature of the business.  Because of its high market share, Dow and the other manufactures named as defendants in the *Urethane Litigation* collectively were able to and did exercise market power, including the ability to raise prices and erect barriers to entry to the markets.

42.     Approximately 94% of all polyols used for flexible polyurethane foam are comprised of Polyether Polyols.  As a result, customers needing Polyether Polyols do not switch suppliers because of the non-transitory, small but significant increase in the prices of Polyether Polyols, thereby setting favorable conditions for the successful implementation of the price-fixing agreement into which Dow was induced to enter, of which conspiracy, Defendant Liveris knew or should have known in his capacity as Chief Executive of Dow and, previously, in other senior management positions.

43.     During the period of the price-fixing scheme in which Dow actively participated, as alleged and ultimately proven in the *Urethane Litigation*, pricing for all three Polyether Polyol products was inter-related.  On numerous occasions during this period, as alleged and proven in the *Urethane Litigation* trial, price increases in the same or similar amounts for Polyether Polyol products were announced by Dow and its co-conspirators and/or became effective on the same day or within a short period of time thereafter.

44.     Changes in the price of raw materials for these products, which are the principal cost of manufacturing these products, did not explain Dow's announced increases in the prices for these products.  Changes in demand for the major end-use of these products, polyurethane foam, did not explain the increases in prices for these products.

45.     As alleged in the *Urethane Litigation*, from January 1, 1999 through at least December 31, 2003, Dow and its co-conspirator defendants engaged in a continuing contract, combination or conspiracy with respect to the sale of Polyether Polyol products in the United States in unreasonable restraint of trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, all of which became known to the serving Individual Defendants during the pendency of the price-fixing conspiracy or no later than the commencement of the *Urethane Litigation*. Upon information and belief, such contract, combination or conspiracy extended well-beyond the borders of the United States and, upon information and belief, Dow may be subject to additional claims for damages other than those specifically identified herein.

46.     The contract, combination or conspiracy consisted of an agreement among Dow and its co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged and to allocate customers and markets for Polyether Polyol products in the United States.

47.   In formulating and effectuating the conspiracy, reflecting the utter failure of, *inter alia*, the Company's antitrust compliance policies and procedures and Board stewardship, Dow and its co-conspirators: (a) participated in meetings and conversations during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain or stabilize prices of Polyether Polyol products in the United States and to allocate customers and markets of Polyether Polyol products; (b) issued price announcements consistent with and sold Polyether Polyol products at the agreed upon prices; (c) allocated customers and markets for Polyether Polyol products in the United States in furtherance of the co-conspirators' agreements; and, (d) participated in meetings and conversations among themselves to implement, adhere and police the price-fixing agreements they reached.

48.   Dow and its co-conspirators engaged in the underlying wrongdoing described above (and as alleged and ultimately proven at trial in the *Urethane Litigation*) for the purpose of carrying out an unlawful agreement to fix, maintain, raise or stabilize prices and to allocate customers and markets of Polyether Polyol products.  Dow and its co-conspirators affirmatively and fraudulently concealed their unlawful conduct from public disclosure.

49.   The alleged wrongdoing that led to the initiation and successful prosecution of the *Urethane Litigation* was compounded by the serving Individual

Defendants' breaches of fiduciary duty in the wake of the antitrust conspiracy. Specifically, the Company's in-house counsel, including Defendant Kalil, recklessly disregarded the evidence and caused Dow to proceed to trial with no believable or legally cognizable defense to the antitrust allegations, leading ultimately to a judgment in excess of $1 billion against the Company and many millions of dollars in legal and related expenses.[4] Additionally, the Individual Defendants failed to adequately disclose publicly the egregious conduct at issue and/or reserve for the massive contingent liability resulting therefrom in a timely manner.  This wrongful conduct was actively participated in by Dow's outside legal counsel, by Defendants Ungerleider and Tate and Deloitte, its outside auditor.

Compounding the problem, the Director Defendants (as well as Defendant Kalil) failed to adequately investigate, pursue or preserve valuable claims against the Company's outside legal counsel and Deloitte, further wasting the Company's assets. As the Court ruled in rejecting Dow's post-trial motions, Trial Counsel "failed to argue at trial that the jury could not find aggregate damages or that a separate trial was required for an adjudication of individual [Class] members damages," a fundamental example of Trial Counsel's malpractice. In the case of

---

[4] The Company became exposed to at least hundreds of millions of dollars of additional liability to those members of the Class in the *Urethane Litigation* who excluded themselves from the Class therein and pursued their price-fixing claims individually. Those claims were recently settled for more than $400 million in addition to the $835 being paid to the members of the Class.

Deloitte, it has repeatedly and without justification "blessed" Dow's annual financial statements when it knew or should have known that such financial statements were materially deficient. Each of the Individual Defendants named herein is personally implicated in the alleged wrongdoing during his or her tenure as officers and/or directors by, *inter alia*, his or her active participation, acquiescence in such wrongful conduct and/or the on-going cover-up of the wrongdoing. As a direct consequence of the Individual Defendants' wrongdoing as alleged herein, Dow was named as a defendant in the *Urethane Litigation*, which was commenced in 2006 and has been litigated by Dow over the course of approximately 10 years, resulting in a judgment against the Company for more than $1 billion for the Class certified therein and now settled at a direct cost of $835 million plus approximately an additional $450 million paid to those who excluded themselves from the Class and pursued their claims individually. In addition, the Individual Defendants have caused the Company to expend tens of millions of dollars to defend the class action and related individual claims in reckless disregard of the overwhelming evidence of wrongdoing by the Individual Defendants responsible for oversight of the Company's antitrust compliance procedures and unjustifiable defense of the claims alleged in the *Urethane Litigation*, all in an effort to protect their personal interests, rather than the best interests of the Company and its shareholders. Indeed, Dow was the last remaining

company continuing to expend its resources in defending the indefensible violations of law challenged in the *Urethane Litigation*. Three other defendants, including Bayer Corp., BASF Corp. and Huntsman International LLC settled the claims of the Class certified by the Court for far less ($140 million) and an additional defendant, Lyondell Chemical Co., settled without paying damages because it was under bankruptcy protection.

50.    In the course of defending against the plaintiffs' claims against the Company in the *Urethane Litigation*, the members of the Board and Dow's senior management (including, in particular,  Defendants Liveris and Kalil)[5] abdicated their business judgment and gave virtually unfettered authority to the Company's trial counsel, David M. Bernick, Esq. and his firm, Boies Schiller & Flexner LLP (collectively "Dow's Trial Counsel"), including, *inter alia*, taking no action against such counsel in the wake of its obvious malpractice discussed herein.[6] By taking no action to preserve such claims by, *inter alia*, obtaining agreements with Dow's Trial Counsel tolling the statutes of limitation applicable to such malpractice

---

[5] Despite Defendant Kalil's control over the defense of Dow, , he did not exercise sufficient control over Dow's Trial Counsel to protect against their malpractice.

[6] In October 2013, Defendant Kalil caused Dow's Trial Counsel to "withdraw" from the representation of the Company post-trial because, *inter alia*, the firm had not properly preserved certain *Daubert* and related objections leading to their waiver. See May 15, 2013 opinion of Judge Lungstrom denying post-trial motions in the *Urethane Litigation*.

and/or other potential claims, the Defendant Kalil and the other Individual Defendants have wasted valuable corporate assets by having permitted such claims to expire.

51.     Similarly, the Individual Defendants have permitted applicable statutes of limitations to run against those of its officers and directors responsible for the underlying violations of the federal antitrust laws and those who acquiesced in it, all of which was alleged and proven in the *Urethane Litigation*. Each of the Individual Defendants who were officers and/or directors of Dow before and during the pendency of the *Urethane Litigation* participated in, acquiesced in and or covered up the illegal conduct and concealed Dow's likely exposure in the wake of such illegal and/or otherwise improper activities. Moreover, when confronted with the claims in and massive evidence of violations of law in the *Urethane Litigation*, the Company and its counsel "stonewalled" at the direction of Defendant Kalil instead of making reasonable efforts to resolve the claims pending. Upon information and belief, the Individual Defendants recklessly disregarded settlement proposals that were well below Dow's potential exposure at trial and a small fraction of the $835 million which the Board eventually agreed to pay to the Class and approximately $450 million more to those who excluded

themselves therefrom. [7] Moreover, they "covered-up" the Company's massive likely liability in connection with the *Urethane Litigation* and falsely represented Dow's exposure therein as not material.[8]

52.     Given their personal knowledge of Dow's fundamental wrongdoing, the Company's Board and senior management were subjecting the Company to massive liability in connection with the violations of federal antitrust law as alleged and proven in the *Urethane* Litigation.

## DEFENDANT LIVERIS' MISUSE OF DOW'S ASSETS

53.     Defendant Liveris, during his long tenure as Dow's Chief Executive Officer, was misusing its assets to a very substantial degree as more fully set forth in the Complaint in *Wood v. The Dow Chemical et al*, Civil Action 1:14-cv-13049 formerly pending in the United States District Court for the Eastern District of

---

[7] As stated by plaintiffs in the *Urethane Litigation* in their brief filed on March 24, 2016 (Docket # 3238): "Typical settlements in antitrust class actions are reached prior to trial for a fraction of single damages. See, e.g., *In re Linerboard Antitrust Litig.,* No. CV. 98-5055, 2004 WL 1221350, at *4(E.D.Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of potential damages).

[8] Referring to the claims in the *Urethane Litigation*, Dow's 10-Q Report filed with the Securities & Exchange Commission on April 30, 2013, Dow falsely represented therein: "The Company has concluded it is not probable that a loss will occur and, therefore, a liability has not been recorded with respect to these matters."

Michigan (the "*Wood Litigation*")[9] including the substantial expenses incurred by the Company related thereto and additional claims made by Dow's former Chief Internal Auditor, Douglas Anderson.   Indeed, as to such latter claims against Defendant Liveris, it is not known whether he took any action outside the Company.[10]

54.   Ms. Wood, a fraud investigator at Dow, alleged that the Company's money had financed vacations, sports junkets and other "perks" for Defendant Liveris and his family. Beyond Ms. Wood's claims, which were also made to the Occupational Safety and Health Administration ("OSHA") as a result of her wrongful firing, a number of Dow's internal auditors have alleged that Defendant Liveris used his position to finance his lifestyle, favor his family and

---

[9] Ms. Wood also commenced a Michigan state as well against Dow as well as Defendants Liveris and Kalil. She alleged that she was fired in 2013 for repeatedly reporting questionable spending by Defendant Liveris on activities unrelated to the Company's business. Ms Wood worked at Dow for 25 years.  The complaint, response to motion to dismiss and OSHA Administrative Complaint are attached as Exhibits 1, 2 and 13 and are incorporated by reference.

[10] A series of internal examinations by Dow's auditors, including Mr. Anderson, spanned a period from 2008 to 2013. Upon leaving the Company in 2013, it has been reported by Reuters, Mr Anderson sent a memo to top Dow officers (and, upon information and belief, to certain of the Director Defendants, labeled "DOW CONFIDENTIAL).". In it, Mr. Anderson raised concerns about what he called "suspected ethical and compliance issues or violations." Both his memo and the *Wood Litigation* raised questions about whether spending that involved Defendant Liveris was properly accounted for by Dow and accurately disclosed to shareholders and the Securities & Exchange Commission ("SEC").

provide at least $16 million in support for his favored charities (e.g. The Hellenic Initiative, co-founded by Defendant Liveris) that burnished his fame in Greece and Australia, where he was born. In her lawsuits and OSHA complaint, Ms. Wood listed an array of perks that, she claimed, Dow had improperly financed for Defendant Liveris, his family and friends including a safari; hundreds of thousands of dollars for Super Bowl parties; and $13,000 in uniforms for his son's basketball team. She also claimed that Dow's internal auditors had identified $13 million in cost overruns on the renovation of a Company-owned hotel involving Defendant Liveris' wife, Paula.

55.     Consistent with his dictatorial management style, Defendant Liveris also told top Dow executives that it was "time for retirement" for one manager who had voiced concerns about the hotel cost overruns, according to emails included in Ms. Wood's OSHA Complaint. According to that Complaint, Defendant Kalil, replied to Defendant Liveris the next day: "Remind me never to piss you off."

56.     These claims and others are referred to in Plaintiff's letter to Dow's Board dated October 31, 2015 attached hereto as "Exhibit "3" (the "Liveris Demand Letter") which states, in part:

> "As you undoubtedly are aware, Kimberly C. Wood, a 25-year employee of Dow, uncovered, *inter alia*, very substantial misuse of the Company's assets by Mr. Liveris as well as material financial statement fraud in connection with an ethylene plant project, most recently in her role as a fraud investigator. Upon information and

belief, at the behest of Mr. Liveris and other officers of the Company, management, including Mr. Kalil, wrongfully retaliated against her, leading to her wrongful termination on October 31, 2013.

In the wake of her termination, Ms. Wood commenced the *Wood Litigation*. Upon information and belief, given the magnitude of Mr. Liveris' wrongdoing and the commencement of the *Wood Litigation*, you were each aware at least generally of the wrongdoing described in Ms. Wood's Complaints and acquiesced in the underlying misconduct. Nevertheless, despite your knowledge, you looked the other way while Dow's resources were utilized to defend against Ms. Wood's claims despite their legitimacy. Ultimately, after an Opinion and Order Denying Defendants' Motion to Dismiss on December 15, 2014, you approved using Dow's funds to silence Ms. Wood and her counsel and to settle the *Wood Litigation*.

Moreover, despite Ms. Wood's findings regarding Mr. Liveris' misuse of the Company's funds, you have taken no steps to thoroughly investigate his wrongful conduct or to require an accounting by an independent auditor so that Dow could have an independent determination of the extent of such wrongdoing so that Dow can be fully repaid. While he reportedly re-paid Dow $719,923 for expenses incurred from 2007 to 2010, that amount remains far less than what should have been re-paid, especially since Mr. Liveris' charging expenses related to personal business and interests appear to be ongoing.

Indeed, on June 2, 2015, two articles appeared in major Australian publications, the *Financial Review* and the *Sydney Morning Herald* (see attached) discussed use of Dow funds to finance, *inter alia*, The Hellenic Initiative (co-founded by Mr. Liveris) and the "use" of Mr. Liveris' chief of staff, Louis Vega, as "staff" of the Initiative. Apparently, a substantial amount of Mr.

36

Liveris' time (while being well-compensated as Dow's CEO) has been spent on personal business in Australia, the United States and elsewhere in the world with no demonstrable benefit for the Company. At minimum, the Board should "clawback" such compensation that has been wrongly paid to Mr. Liveris."

57.    Although Dow's proxy statements have made some disclosures of Defendant Liveris' **use** of the Company's assets, in breach of his and the Board's duty of candor owed to Dow and its shareholders, upon information and belief, there has been no independent accounting or public disclosure of the full extent of his **misuse** of Dow's assets which misuse Dow's Audit and Compensation Committees have, *de facto,* ignored.

58.    In his deposition in the *Wood Litigation*, taken on December 17, 2014, Mr. Anderson also testified that Defendant Kalil, among Dow's highest-paid executives, encouraged him to ignore the questioned expenses involving Defendant Liveris, advising Mr. Anderson to "let these things go."

59.    Following his inability to effectuate changes in Defendant Liveris' wrongful conduct, Mr. Anderson retracted years of annual reports he had submitted to the Board's Audit Committee saying that, in essence, such reports vouching for the expenses of Dow executives (including, in particular, those of Defendant Liveris) were inaccurate. Upon information and belief, to this day, despite a partial repayment to Dow by Defendant Liveris, neither the members of the Board's Audit Committee nor the Company's purportedly independent auditor, Deloitte, sought a

complete accounting and repayment of Defendant Liveris' misuse of Dow's assets. Neither did the Board seek any disciplinary action against him for this most serious breach of fiduciary duty.

60.     Moreover, compounding Defendant Liveris' personal wrongdoing, the entire Board caused the issuance and dissemination of proxy statements which misrepresented Dow's true state of affairs, particularly with regard to Defendant Liveris' compensation and the ineffectiveness of the Company's financial controls.

61.     A comparison made by Reuters of the "disclosures" made in Dow's 2011 Proxy Statement sent to the Company's shareholders and Mr. Anderson's testimony at his deposition revealed the following material differences:

## Auditor offers translation of company's proxy

Key concerns of former Dow internal watchdogs Doug Anderson and Kimberly Wood are alleged inaccuracies in the company's 2011 proxy statement. In a sworn deposition last December in a Wood lawsuit against Dow, Anderson dissects the proxy statement and highlights portions that he claims are inaccurate or misleading:

| PROXY LANGUAGE | ANDERSON DEPOSITION |
|---|---|
| "The Company's Corporate Auditing Department conducts routine audits of various Company departments and locations on a periodic basis." | "Anybody reading that will assume this was a routine audit. It wasn't…. This was a targeted audit based on specific risk issues that we thought were there." |
| "The audit of the Customer Events Department found shortcomings in record-keeping and processing, as well as a failure of current policies and procedures to provide sufficient guidance to avoid confusion and/or misapplication of those policies and procedures." | "Knowing that the company shouldn't pay for your son's birthday party … is not a lack of sufficient guidance. Knowing that you take two couples to the cricket World Cup in Barbados that are not customers on a vacation is not lack of sufficient guidance." |
| "In connection with those findings, it was determined that certain expenditures incurred on behalf of Mr. Liveris during the period 2007-2010 were not primarily business related…" | "Saying they're not primarily business-related. It's like no, no. They were not business-related, period. The word 'primarily' misleads. It sounds like there's a grayness." |
| … or should have been processed by the Customer Events Department as personal expenses and were not billed to Mr. Liveris by the Customer Events Department when incurred." | "To blame this on that the department forgot to bill Liveris, the department never billed Liveris for anything. The department never billed anybody for anything. This was not just 'Oops, we forgot to bill.' The department didn't bill." |
| "The Corporate Auditing Department presented the results of the audit to Mr. Liveris who then promptly reimbursed the Company for its expenditures in the amount of $719,923." | Anderson claims a top Dow official said he "should basically stand down and let these things go." Instead, he said he continued to push to get Liveris to reimburse the company. A third-party auditor was brought in to verify what Anderson's group had identified. |

Source: Dow's 2011 proxy statement                    Source: Anderson deposition, Dec. 17, 2014

62.     Despite the Board members' breach of their duty of candor and Defendant Liveris' egregious conduct, the Board and its various Committees would not challenge Defendant Liveris.  Indeed, notwithstanding his long history of wrongdoing, including his self-dealing and waste of the Company's assets, in the context of the proposed merger between Dow and DuPont, the Board has authorized Defendant Liveris to be paid a total of approximately $53 million in cash, stock and tax reimbursement payments. Such compensation is part of the very generous "golden parachute" contract that his colleagues on the

Compensation Committee and the Board as a whole bestowed upon him despite the fact that he is retiring upon his own volition as well as there being an on-going investigation of Defendant Liveris' misuse of Dow assets by the SEC.[11]

## DUTIES OF THE INDIVIDUAL DEFENDANTS

*Fiduciary Duties*

63.     The Individual Defendants, because of their positions of control and authority as directors and/or senior-most officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  By reason of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of Dow, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of trust, loyalty, good faith, candor and due care, and were required to do their utmost to control and manage the affairs of Dow in a fair, just, honest and equitable manner.    The Individual Defendants were required to act legally (including being required to take appropriate steps to ensure that their subordinates did so as well) in furtherance of the best interests of Dow and its stockholders so as

---

[11] It is not clear whether the SEC investigation is limited to the spending allegations or is broader in scope. It is also unclear whether  the SEC ordered Dow, Defendant Liveris or other Company officers to produce documents or testify as part of the government's investigation. The SEC did, however, issue subpoenas for thousands of pages of documents and testimony related to the claims alleged in the *Wood Litigation*.

to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit.

64.    Each officer and director of Dow owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

65.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants, consistent with their duty of candor, had a duty to timely disseminate accurate information regarding the Company's operations, finances, performance, management, projections, and forecasts so that the market price of Dow's stock would be based on truthful and accurate information. During the period of the wrongdoing alleged herein, the Individual Defendants caused Dow to issue and disseminate false and misleading financial statements, which, *inter alia*, concealed material facts such as the Company's lack of effective controls and the true nature of its exposure in the wake of its illegal price-fixing scheme and their acquiescence in Defendant Liveris' misuse of Dow's assets. Moreover, each of the Individual Defendants (other than Defendant Liveris) placed their fealty to Defendant Liveris above not "rocking the boat," which would have put in jeopardy their respective positions as officers or directors of Dow. As to those members of the Board who joined it following a deal made between Daniel

Loeb (and his company, Third Point) and Defendant Liveris to silence criticism of himself and the entire Dow Board, they can hardly be considered likely to "rock the boat" given the circumstances surrounding their appointment and subsequent election.

***Control, Access and Authority***

66.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Dow, especially under Defendant Liveris' domination and demanded loyalty, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various misleading public statements disseminated by the Company. Further, due to the nature of the Individual Defendants' wrongdoing, they are not entitled to the potential protection afforded by the exculpatory provisions of Delaware law, the Company's Articles of Incorporation and/or by-laws.

67.    Because of their executive, managerial and directorial positions, during the time of their respective tenures, each of the Individual Defendants had access to adverse, non-public information about Dow's lack of compliance with federal, state and regulatory antitrust laws and guidelines, financial condition, operations and misleading representations and had a duty to refrain from selling Dow stock while in possession of such undisclosed material adverse information.

68.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dow, and was at all times acting within the course and scope of such agency.

**_Reasonable and Prudent Supervision_**

69.   To discharge their duties, the senior-most officers of Dow and the Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)    ensure that the Company complied with applicable legal obligations, requirements and regulations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Dow conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(d)    ensure that Dow was operated in a diligent, honest and prudent manner in compliance with applicable laws, rules and regulations;

(e)     properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements about the Company's operations and financial results;

(f)     implement adequate internal controls to ensure that the Company complied with all regulatory and legal requirements and to ensure that the Company remedied or reported any defects with its products to the proper regulatory bodies as well as to the Company's shareholders; and

(g)     establish and implement appropriate risk assessment and risk management procedures.

70.     Further, the Company's website touted the "Leadership" of Dow and states that "[a]t Dow, our leadership organization places decision-making at the appropriate level and ensures that the proper checks and balances are in place." The website made specific representations regarding the Board's clear acceptance of responsibility and purported oversight, stating that: "Dow's Board of Directors is intimately involved in the strategy and operations of the Company – conducting thorough reviews and asking difficult questions.   Dow exemplifies good governance with a lead director; directors with solid, diverse experience and credentials, corporate governance guidelines; and codes of business conduct and financial ethics."

71.     Dow's direct and indirect participation in a conspiracy to fix, raise and/or stabilize prices of urethane chemicals and to otherwise engage in the

wrongful conduct set forth herein, including failure to act to preserve valuable claims against its outside auditor and legal counsel arising from such improper activity while protecting the personal benefits of the Individual Defendants, was not the result of a rogue employee or division. Instead, notwithstanding Dow's Code of Business Conduct and Code of Financial Ethics, and other public representations on its website and elsewhere, the Individual Defendants' misconduct reflected a Company-wide, "anything goes" business philosophy, directed, encouraged and aggressively pursued by Defendant Liveris.

72.    Such philosophy was aimed at increasing Dow's revenues and profits through unscrupulous business practices, as well as improper charges and personal expenditures, without due regard to the long-term consequences of such wrongdoing.  Upon information and belief, the widespread abusive practices and illegal activities described herein were well-known to senior management and the entire Board, and were knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to Dow and its shareholders.  By knowingly, recklessly or negligently permitting these business practices and strategies to continue, notwithstanding Dow's well-publicized codes of behavior and ethics, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of each Board member's fiduciary duty of loyalty and good faith.

### *Code of Business Conduct and Ethics Allegations*

### **Dow's Code of Business Conduct**

73.     The Company's Board established the Codes of Conduct and published them extensively, despite knowing that they were not being and would not be followed by the Individual Defendants.  The Company's March 28, 2014 Proxy Statement assured Dow's shareholders that:

> "All Directors, officers and employees of Dow are expected to be familiar with the Company's Code of Business Conduct, and to apply it in the daily performance of their Dow responsibilities.  The Code of Business Conduct is intended to focus employees, officers and Directors on our corporate values of integrity and respect for people, help them recognize and make informed decisions on ethical issues, help create a culture of the highest ethical and business standards, and provide mechanisms to report unethical conduct."

74.     The personal obligations established by Dow's Code of Business Conduct ("Code of Conduct") were breached by the Individual Defendants, who are accountable to the Company as well as Plaintiff and the other Dow shareholders for the damages caused to Dow.  All such conduct has caused, and will continue to cause the Company and its shareholders substantial economic, reputational and other damages.

75.     Dow's Code of Conduct is published on Dow's website and incorporated by reference in its proxy statements filed with the SEC and distributed to shareholders.  The Code of Conduct describes the purported policies

of conduct followed by the Individual Defendants in conducting Dow's business operations.

76.     The Code of Conduct was approved by the Company's Board of Directors, which was directly responsible for approving and causing the publication of the misrepresentations set forth therein.  Compliance with the Code of Conduct is purportedly overseen by Dow's Office of Ethics and Compliance, with oversight by the Company's General Counsel and the Audit Committee of the Board.

77.     In a letter prefacing the Code of Conduct, Defendant Liveris falsely represented that the Company was one of "unquestionable integrity" and that "Our values of integrity, Respect for People and Protecting our Planet are evident in our corporate culture and connect each of us around the world."    His misrepresentations continued:

> "The Diamond Standard, Dow's Code of Business Conduct, puts a framework around these Values that is multifaceted and clear, setting expectation and guiding our behavior.  Our intent, of course, is to enable ethical, lawful decision-making and to create an environment of respect, but that's not all.  We believe it is also our responsibility."

78.     As set forth herein, contrary to Defendant Liveris' representations and assurances, as he was undoubtedly aware, the Company was engaged in a massive price-fixing conspiracy in violation of antitrust laws, unethical ways of doing

business and securities fraud.  All the while, during at least a decade, he was misusing Dow assets for his personal benefit and/or wasting them profligately. The Individual Defendants knowingly or recklessly permitted these abuses to occur, or passively acquiesced therein and/or in the cover-up of such wrongdoing, with full knowledge of the risks to Dow inherent in their deliberate strategy.

79.    The Code of Conduct contains numerous representations specifically relating to competition and antitrust, which the Individual Defendants knew, or should have known were false, including the following:

- Our responsibility to conduct business ethically extends to our relationships with customers, shareholders, suppliers, competitors and regulators.  This means competing within appropriate legal boundaries and on the basis of price, quality and service. (Code of Conduct, p. 14)

- We win business ethically **and obey all antitrust and trade laws**, which demand free and fair competition. *(Id.)* (emphasis added).

- We do not have discussions or reach agreements with competitors or others that may restrict open competition. This includes conversations with competitors about: price or credit terms; submission of bids or offers; allocation of markets or customers, or division of territories; restrictions on production or distribution; boycotts of suppliers or customer.  *Id.*

- We do not engage in unfair, misleading or deceptive trade practices.  *Id.*

80.    As outlined above, the Individual Defendants violated the Company's Code of Conduct in a systematic and sustained price-fixing conspiracy and trade law violations culminating in the _Urethane Litigation_ and its eventual settlement. Thereafter, the Individual Defendants failed to properly and adequately disclose the exposure to the Company from the _Urethane Litigation_ or to properly account and reserve for such liability, violated federal securities laws and wasted the Company's assets in the futile defense of its internally well-known antitrust violations, as well as deliberately failing to resolve those claims on more favorable and available financial terms. In short, despite the tenets of the Company's Code of Conduct, the Individual Defendants left ethics, integrity and fair trade and compliance with the law by the wayside on management's quest for ever higher revenues and thus, higher compensation and ever more lucrative incentives for themselves, in breach of their fiduciary duties.

81.    Defendant Liveris, the members of the Audit Committee, the Company's General Counsel, Defendant Kalil, and each of the other Individual Defendants knowingly and in bad faith failed to adhere to the standards, policies and procedures contained in the Code of Conduct and the Company's related policies and procedures.  Moreover, each of the Individual Defendants, despite their personal knowledge of the wrongdoing alleged herein and the seriousness thereof, failed to fulfill his/her obligation to report suspected violations of the Code

or to take appropriate action in the face of Plaintiff's particularized pre-suit demands.

## Dow's Code of Financial Ethics

82.   Dow's Code of Financial Ethics is published on Dow's website.  The Code of Financial Ethics, applicable to the Company's Chief Executive Officer, Principal Financial Officer, and Principal Accounting Officer (collectively the "Senior Financial Officers"), sets forth specific policies to guide the Company's Senior Financial Officers in the performance of their duties.   The Code of Financial Ethics supplements the Code of Conduct and creates additional obligations for the Company's Senior Financial Officers including Defendants Tate and Ungerleider.

83.   The Code of Financial Ethics provides that the Senior Financial Officers "hold an important position with respect to the ethical and responsible conduct of the Company, and other corporate governance issues."

84.   The Code of Financial Ethics promises that the Senior Financial Officers will advocate and promote the following standards, principles and responsibilities, among others:   (1) honest and ethical conduct; (2) full, fair, accurate, timely and understandable disclosure in reports and documents submitted to governmental agencies, including the SEC; (3) compliance with applicable governmental laws, rules and regulations, (4) prompt internal reporting of

violations of the Code of Financial Ethics and the Code of Business Conduct to the Audit Committee and the Board of Directors; (5) accountability for adherence to the Code of Financial Ethics; (6) acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing independent judgment to be subordinated; and (7) responsible use and control over all assets of the Company.

85.   As set forth above, Dow's Senior Financial Officers, Defendants Tate and Ungerleider, violated the Company's Code of Financial Ethics in a systemic and sustained manner, misrepresented or failed to disclose the true financial and operating condition of the Company, and participated in or acquiesced in violations of federal antitrust, other trade regulations and other laws. Moreover, they participated with Defendant Liveris in concealing Defendant Liveris' misuse of Dow assets and took retaliatory action against Ms. Wood and other "whistle-blowers."

86.   The Company's Senior Financial Officers, as well as all of the other Individual Defendants, failed entirely to create a culture of high ethical standards and commitment to compliance, subjecting Dow and its shareholders to more than $1.2 billion dollars in damages, as well as expensive, time consuming and on-going litigation and substantial civil liability from both almost concluded (the *Urethane Litigation*) and potential future class action and other litigation.

### *Audit Committee Allegations*

87.     Defendants Bell, Ringler, Loughridge and Shaw (the "Audit Committee Defendants")[12] owe and owed specific heightened duties as members of the Board's Audit Committee. Pursuant to the Audit Committee's Charter, these Defendants are responsible for being the Board's front line in the oversight of internal controls and legal compliance, accurate financial reporting and accounting and enforcement of the Company's Code of Business Conduct and Code of Financial Ethics.

88.     Dow's current and prior Audit Committee Charters state, in substance:

The Audit Committee is appointed by the Board to assist the Board in monitoring:

1.     The integrity of the financial statements (and related processes of the Company.

2.     The independent auditors' qualifications, independence and performance.

3.     The performance of the Company's internal audit function.

4.     The compliance by the Company with legal and regulatory requirements.

5.     Such other Company operations and functions as may be directed by the Board of Directors from time-to-time.

---

[12] Defendant Loughridge joined the Audit Committee in 2015.

89.     During the period of the wrongdoing alleged herein, the members of the Audit Committee, during their respective tenures, failed to fulfill their oversight responsibilities with respect to the accounting, controls and financial reporting processes of the Company, including the integrity of the financial statements and other financial information, which they knew or should have known were not accurate, were not audited properly by an independent auditor and suffered material control shortcomings. Each of them knew or should have known that Dow's financial statements were not prepared in accordance with generally accepted accounting principles or audited by Deloitte in conformity with generally accepted auditing standards.

90.     Moreover, each of the members of the Audit Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with legal and regulatory requirements including, *inter alia*, federal antitrust laws and regulations and federal securities laws.  At all relevant times, the members of the Audit Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein. In addition to each of such members of the Audit Committee being members of the Board, they were charged with specific responsibilities that enhanced their access to such documents and information pursuant to the Audit Committee Charter

which required them to, *inter alia*:  (a) review and discuss with management and Dow's purportedly independent auditor the Company's annual audited financial statements, including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K; (b) discuss with management and the Company's independent auditor significant financial reporting issues and judgments made in connection with the preparation of its financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of significant control deficiencies; (c) discuss with management the Company's major financial risk exposures (including, *inter alia*, its exposure in the *Urethane Litigation)* and oversee the steps management takes to monitor and  control such exposures and to implement and follow the Company's risk assessment and risk management policies, and coordinate the reviews and results of reviews by the other Committees and the full Board of Directors in their respective risk areas.

91.   With respect to Compliance Oversight Responsibilities, the Audit Committee was required to*, inter alia*: (a) Obtain reports from management, the Company's senior internal auditing executive and the independent auditor, Deloitte, concerning whether the Company and its subsidiary/foreign affiliated

entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Code of Financial Ethics; (b) In conjunction with the Governance Committee, oversee the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Code of Financial Ethics, including reviewing and recommending to the Board of Directors any amendments to such codes. The Audit Committee shall review and recommend to the Board any waivers of such codes with respect to any employees or executives as it determines appropriate; (c) Oversee the Company's compliance programs, including the Company's Code of Business Conduct and Code of Financial Ethics, and, at least annually, meet to review the implementation and effectiveness of the Company's legal and ethical compliance programs with the chief compliance officer, who shall have the authority to communicate promptly and directly to the Audit Committee about any matters involving criminal or potential criminal conduct; and (d) Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

92.    As set forth herein, the Audit Committee Defendants breached their fiduciary duties of loyalty and good faith owed to the Company and failed to fulfill their obligations as required of them by Dow's Audit Committee Charter.

93.    In light of the widespread nature of the wrongdoing referred to herein, the members of the Audit Committee effectively acquiesced therein and were (and are) personally responsible for the cover-up of such wrongdoing.

94.    In particular, the members of the Audit Committee, when confronted with the facts unearthed by Ms. Wood, Mr. Anderson and other internal audit personnel, sidestepped their well-founded conclusions and acquiesced in a relatively modest repayment by Defendant Liveris in connection with his multi-million dollar misuse of Dow assets.  The members of the Audit Committee, as well as the other members of the Board, are liable to Dow for their breaches of fiduciary duty set forth herein.  Indeed, the Audit Committee was specifically tasked with control and oversight over the very conduct that went so awry at Dow and the subsequent lack of disclosure regarding such wrongdoing and the ensuing substantial liability and damages caused to the Company.  As such, they (as well as other members of the Board) were not and could never be considered independent, disinterested or capable of adequately and objectively investigating in good faith the wrongdoing claimed by Plaintiff in his pre-suit demand letters and otherwise.

95.    Moreover, upon information and belief, despite their knowledge of the Company's illegal practices including those made in connection with the *Urethane Litigation*, neither the members of the Audit Committee nor the Board as a whole commenced any serious internal investigation of the wrongdoing as alleged by

Plaintiff.[13] Moreover, consistent therewith, they continued to appoint Deloitte as Dow's auditor rather than a truly independent auditor that would expose such wrongdoing.

### *Governance Committee Allegations*

96.    Defendants Fettig, Bell, Miller and Reilley (the "Governance Committee Defendants") owed specific heightened duties as members of the Board's Governance Committee.  Pursuant to the Governance Committee Charter, these Defendants are responsible for, *inter alia*, assisting the Board with oversight of corporate governance matters, as well as all matters relating to the selection, qualification, and compensation of members of the Board and all matters relating to the duties of the members of the Board.

97.    The  Governance Committee Charter provides that the Committee has authority and responsibility for the following, among other things: (a) develop and recommend to the Board qualifications criteria for members of the Board of Directors;  (b)  recommend  and  nominate  members  and  chairs  of  standing Committees of the Board in consultation with the Chairman of the Board; (c) recommend and nominate individuals for election as officers of the Company; (d)

---

[13] As discussed more fully below, the investigations commissioned by Dow's Board did not seriously consider the pursuit of any of Dow's claims but, rather, proceeded in a manner that was intended to provide the Individual Defendants (and, indirectly, the Company) with ammunition in an attempt to justify their forthcoming motions to dismiss this Complaint.

oversight of corporate governance matters; (e) develop and recommend to the full Board the Corporate Governance guidelines for the Company; review and reassess at least annually the adequacy of the Corporate Governance Guidelines and make recommendations for amendments as appropriate; (f) together with the Audit Committee, review and recommend to the Board any amendments to the Company's Code of Business Conduct and Code of Financial Ethics; (g) oversee annual performance evaluations of the Board of directors; (h) oversee the orientation of new Directors.

98.    Further, the Governance Committee was responsible for overseeing the annual evaluation of the Board and the Board Committees to, *inter alia,* ensure compliance with Company policies and procedures.  The Governance Committee failed to meaningfully evaluate Board members' qualifications or performance and/or to take action to ensure that the Individual Defendants, particularly Defendant Liveris, were fulfilling their fiduciary obligations to the Company and had no conflicts of interest.

99.    Each of the members of the Governance Committee serving at the times of the wrongdoing alleged herein was personally aware or should have been aware that the Company was not in compliance with federal antitrust laws and regulations and, in fact, was engaged and engaging in an illegal price-fixing conspiracy.    Thereafter, the members of the Governance Committee knew or

should have known that the Company's defense of the *Urethane Litigation* was baseless and a waste of corporate assets and that such claims should have been settled pre-trial.

100.   At all relevant times, the members of the Governance Committee had total access to all documents and information bearing upon the Company's operations including the information relevant to the wrongdoing referred to herein including, in particular, the "whistleblower" complaints of Ms. Wood and others. In addition, each of such members of the Governance Committee, being members of the Board, were charged with specific responsibilities, as described above, that enhanced their access to such documents and information pursuant to the Governance Committee Charter.

101.   Among the additional responsibilities charged to the Governance Committee by the Board were the investigations of Plaintiff's various pre-suit demands upon the Board as discussed more fully below. In connection with such "investigations," orchestrated by Defendant Kalil and certain presently unknown counsel to the Board, there was never any *bona fide* interest by the Board, the Governance Committee or Defendant Kalil to act objectively upon Plaintiff's demands or give any consideration to the possibility of the Board's acting affirmatively based thereupon.

102. Indeed, the "investigations" carried out were nothing more than an enormous waste of the Company's assets since they generated absolutely no benefit to Dow and were structured solely to benefit Defendant Liveris, the other Individual Defendants and others whose conduct was claimed to be wrongful in Plaintiff's demand letters.

103. In addition to refusing to act affirmatively upon Plaintiff's demands, the Governance Committee Defendants, directly and/or through subordinates, blatantly violated the Company's corporate governance policies by, *inter alia*, participating and/or acquiescing in the wrongdoing and/or failing to have in place adequate internal controls and oversight to prevent the widespread wrongdoing and violation of federal antitrust and trade laws and regulations, Defendant Liveris' misuse of Dow's assets and other wrongdoing set forth herein, which was systemic and ongoing, all of which has caused Dow substantial damages.

## Corporate Governance Guidelines

104. Dow's Corporate Governance Guidelines purportedly reflect the "Board's purpose to build long-term value for Dow stockholders and to ensure the continuity and vitality of the Company's businesses by setting policy for the Company, selecting the Chief Executive Officer, providing for succession planning, monitoring the performance of both the company and the CEO, overseeing strategic planning and providing management with appropriate advice

and feedback." According to the Corporate Governance Guidelines, "[m]anagement is responsible for and the Board is committed to ensuring that Dow operates in a legal and ethically responsible manner."

105.   Contrary to these representations, as demonstrated above, the Board failed to effectively monitor either policy or decision-making, instead breaching their fiduciary duties by participating in, acquiescing in and/or failing to prevent widespread illegal practices and their cover-up and a myriad of other wrongdoing, as alleged herein.  Further, contrary to the Corporate Governance Guidelines that a director is expected to possess "strong values and discipline" and "high ethical standards" the Individual Defendants had neither strong values nor high ethical standards as Directors, thus enabling the wrongdoing described herein to occur and continue.

106.   The Corporate Governance Guidelines provide that the Governance Committee is responsible for overseeing the annual evaluation of the Board and the Board Committees.  To the detriment to Dow, no meaningful review or evaluation of the Board or its committees took place, permitting the wrongdoing to occur and continue without consequence to the Individual Defendants.

107.   Each of the Individual Defendants breached the Company's Corporate Governance Guidelines by, *inter alia*, their participation and acquiescence in the wrongdoing alleged herein, failing to implement sufficient internal controls to

prevent and/or minimize the alleged wrongdoing and failing to adequately investigate the alleged wrongdoing and remove those responsible in the face of ongoing investigations and lawsuits.

### *Compensation and Leadership Development Committee Allegations*

108.   At relevant times, the members of Dow's Compensation and Leadership Development Committee were Director Defendants Reilley, Banga, Fettig and Milchovich.[14]

109.   Dow's Compensation and Leadership Development Committee Charter provides as follows:

> The Compensation and Leadership Development Committee ("Committee") shall discharge the Board's responsibilities relating to the Total Compensation (defined as compensation, benefits and perquisites) of the Company's Chief Executive Officer and other Senior Executives in a manner consistent with and in support of the business objectives of the Company, competitive practice, and all applicable rules and regulations.

110.   Among the specific responsibilities of the Individual Defendants who were members of the Compensation and Leadership Development Committee were, *inter alia*, the following:

>    a.   Establish and oversee the compensation philosophy of the Company.

---

[14] Defendant Milchovich joined such Committee in 2015.

    b.    Review corporate and individual goals and objective relevant to CEO Total Compensation, conduct an evaluation of the CEO's performance relative to those goals and objectives, and determine the CEO's Total Compensation level based on this evaluation.  In determining the long-term incentive component of CEO Total Compensation, the Committee will consider the Company's performance, relative shareholder return, the value of long-term incentive compensation given to CEOs at comparable companies, and the awards give to the CEO in the past years.

    c.    Oversee and determine the Total Compensation of Senior Executives of the Company taking into account the proposals and recommendations of the CEO.

    d.    Periodically review and monitor processes and initiatives related to work environment and culture.

111.  The members of the Compensation and Leadership Development Committee failed to align the compensation of senior executive management and the Board with appropriate risk management practices and risk taking incentives, and instead permitted a structure where short term profits and greed were permitted to override sound and ethical business practices and decision-making.  The Board and senior management, and in particular Defendant Liveris, were handsomely compensated without meaningful evaluation as to such members' performance in relation to stockholder value and long-term performance incentives, particularly in the context of the personal wrongdoing alleged herein. Notwithstanding such wrongdoing, Defendant Liveris was and is being compensated excessively

including having been provided with a "golden parachute" contract which will provide him with approximately $ 53 million in cash, stock and reimbursement payments upon his voluntary retirement. As such, each member of the Compensation and Leadership Committee breached and is breaching his duties pursuant to the Committee charter.

## DERIVATIVE ALLEGATIONS

### General Derivative Allegations

112.   Plaintiff brings this action derivatively in the right and for the benefit of Dow to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment, the failure to institute and maintain adequate internal controls over Dow's compliance with legal and regulatory guidelines, including with respect to, *inter alia*, the Company's dealings with its competitors and other wrongful conduct by the Individual Defendants as alleged herein.

113.   Plaintiff owns and has continuously owned common stock in Dow beneficially during the period of the wrongdoing alleged herein.

114.    The Individual Defendants are named herein solely with respect to their misconduct while serving as officers and/or directors of the Company. In the case of defendants Davis, Loughridge, Milchovich and Miller, they are named as defendants herein principally due to their failure to cause Dow to investigate fairly and objectively the claims upon which Plaintiff's pre-suit demands were based and

to take the actions demanded. Moreover, they failed to take any action to urge the Board to settle the claims against Dow in the *Urethane Litigation* while they could still be settled for a relatively small fraction of the more than $1.2 billion ultimately being paid by Dow.

115. These defendants agreed to serve on Dow's Board in exchange for a so-called "standstill agreement" reached with "activist investor," Daniel S. Loeb and his firm, Third Point, who had accused the Board (and, in particular, Defendant Liveris) of material wrongdoing in their stewardship of the Company including certain of the claims set forth herein. The "standstill" agreement, reached on or about November 20, 2014, prohibited Mr. Loeb and Third Point from publicly criticizing Dow and its Board for a period of one year, prior to which they had been unrestrained from doing so. In their approval of such agreement, the members of the Board put their loyalty to Defendant Liveris before their obligation to put the interests of Dow before all others and intentionally disregarded the claims made by Mr. Loeb and Third Point.

116. Plaintiff makes these allegations upon personal knowledge as to his ownership of Dow common stock and, as to all other matters, upon information and belief based upon the investigation of his undersigned counsel which includes, among other things: (1) a review and analysis of Dow's public filings with the SEC and/or sent to the Company's shareholders; (2) a review of press releases,

news articles, and other public statements and reports issued by or concerning Dow and/or the Individual Defendants named herein; and (3) a review of court records in the Ur*ethane Litigation* and in the *Wood Litigation* and regulatory proceedings, including but not limited to, pleadings and other documents filed in these actions.

## Plaintiff's Pre-Suit Demands Upon Dow's Board

117.  This action seeks damages from the Individual Defendants resulting from their alleged wrongdoing.  As described more fully below, Plaintiff made pre-suit demands on the Board of Directors of Dow (the "Board") as required by Rule 23.1, Fed. R. Civ. P. on March 4, May 21, July 30 and November 28, 2013, (Exhibits "4," "5," "6," and "7," respectively, hereto) on September 29, 2014 (Exhibit "8" hereto) and October 31, 2015 (Exhibit "3" hereto) with respect to the matters alleged herein (collectively, the "Demand Letters"), all of which are incorporated herein by reference. In connection with the Demand Letters, Plaintiff's counsel, Richard D. Greenfield, Esq. offered on multiple occasions to address the Board. In each such instance, his offers were rejected or ignored.

118.  The demands set forth in the Demand Letters, as discussed below, have been constructively and/or actually rejected such as the demands made in*, inter alia,* Plaintiff's March 4 and July 30, 2013 Demand Letters which have been affirmatively (and wrongfully) rejected by the Board.  See August 7 and December

20, 2013 letters from Amy E. Wilson, Esquire, an in-house counsel at Dow.(Exhibits "9" and "10" hereto).[15]

119.  On March 4, 2013, Plaintiff sent the first of his written demands focusing on the underlying violations of the federal antitrust laws and the Board's "disregard of the evidence" which resulted in the commencement of the *Urethane Litigation*. Dow's in-house counsel, Amy E. Wilson, Esquire, responded on March 13, 2013 stating*, inter alia:* "We are in receipt of your correspondence and a copy is being provided to the Board of Directors for their review and consideration at their next regular Board meeting which is scheduled for April 10-11, 2013.

120.  On April 22, 2013, Ms. Wilson wrote again to Mr. Greenfield stating: "At this [April 10-11, 2013 Board] meeting, **the Board reviewed and discussed the Demand Letter and adopted a resolution assigning to the Governance Committee of the Board , or any other action the responsibility to consider the facts and circumstances surrounding the Demand Letter** and to recommend to the Board whether the actions demanded, or any other action with respect to the subject matter of the Demand Letter, would be in the best interests of the Company and its stockholders. The Governance Committee also met on April 11, 2013, in

---

[15] As to Ms. Wilson's August 7, 2013 letter, although it appears to have been sent by her, it was never received by Plaintiff or his counsel nor is there any evidence of its receipt. Plaintiff's counsel learned of its existence only after the initial Complaint was filed.

order to review and outline further steps to fulfill this responsibility **including the retention of counsel** and conduct of a full evaluation" [emphasis added]

121.  The retention of counsel at the April 11 Governance Committee meeting was, to say the least, highly irregular since no responsible attorneys could take on such a serious responsibility without first having conducted conflict checks and the Governance Committee having conducted its own detailed analysis of various counsel's independence, disinterestedness and objectivity none of which it had an opportunity to do prior to such meeting. Upon information and belief, counsel was pre-selected for the Governance Committee by, *inter alia,* Defendant Kalil. The selection of counsel was not made with a concern for independence, disinterestedness and objectivity but, rather, with the objective of putting the interests of Dow's officers and directors before those of the Company.

122.  Mr. Greenfield responded to Ms. Wilson by email on May 1, 2013 asking her three brief questions:

> 1.    Who are the present members of the Board's Governance Committee?
>
> 2.    Does the Governance Committee have its own legal counsel? If so, whom and when was such counsel selected?
>
> 3.    Have you or any executive of Dow or any member of its legal Department played any role in determining how our client's "demand letter" would be addressed by the Board and/or setting the Governance Committee's mandate with respect to it?"

123.   In response to the email to Ms. Wilson, on May 7, 2013, Mr. Greenfield received an email from the Governance Committee's appointed counsel, Kenneth J. Nachbar, Esquire of Morris Nichols Arsht & Tunnell, LLP ("MNAT"). Mr. Nachbar said, *inter alia*:

> "Your client's demand has been referred to the Governance Committee of Dow for consideration and recommendation. The current members of the Governance Committee are Jeff M. Fettig, James A. Bell and Dennis H. Reilley. The Committee retained MNAT as its counsel on April 11, 2013. **As I am sure that you can appreciate, it is likely to take several months to investigate, and for the Governance Committee to make a recommendation** concerning, your client's demand." [emphasis added]

124.   Mr. Nachbar and MNAT, although highly competent with respect to corporate governance issues and litigation, specifically lacked the independence, disinterestedness and objectivity required under the circumstances. Demonstrating his lack of personal independence and dependence on the goodwill of Defendant Kalil, Mr. Nachbar's website proclaimed his previous representation of Dow in "seminal cases involving Delaware corporate law." Further, he and his firm have a long history of uniformly recommending the rejection of shareholder demands such as those made by Plaintiff and, presumably, was retained for that very

reason.[16]

125.   Mr. Nachbar and his firm were selected to represent the Governance Committee with regard to the pre-2015 Demand Letters because he and his firm have a long history of handling shareholder demands upon boards of directors, have represented Dow previously and because Dow's Board and Defendant Kalil, in particular, could realistically expect that any investigation he and MNAT would oversee would be protective of the Individual Defendants and not be conducted in Dow's best and primary interests. Indeed, both Ms. Wilson and Mr. Nachbar simply refused to answer a number of basic questions presented to him which, *inter alia*, addressed the *bona fides* of the process set in motion to consider Plaintiff's demands. The answers to these questions would have exposed the sham nature of the process as well as the lack of objectivity and biases of Mr. Nachbar and MNAT, the identity of those responsible for their hiring and the general unfairness of the investigative process the Board and Defendant Kalil put in place

---

[16] As to the demands made in Plaintiff's October 31, 2015 Demand Letter (the "Liveris Demand Letter"), while they have also been referred by the Board in February 2016 to the Governance Committee, the Company has not revealed which counsel is representing such Committee although Plaintiff believes that MNAT and Mr. Nachbar were again retained. After Plaintiff's counsel, Richard D. Greenfield, Esq. offered to address the Board with respect to the Liveris Demand Letter sent on October 31, 2015, on December 10, 2015, Mr. Nachbar said: "Your most recent letter has be [sic] forwarded to Dow and the Board has been made aware of it.  Thus, you do not need to take further action to bring it to the Board's attention.".

to respond to Plaintiff's pre-suit demands.

126.  In light of the retention of Mr. Nachbar and his firm and their infirmities as independent counsel, on May 8, 2013, Mr. Greenfield wrote to him as follows, referring to earlier correspondence with Ms. Wilson:

> "Thanks for your email of yesterday.
> It, as well as Amy Wilson's correspondence, raise a number of questions, three of which were included in my email to her of May 1. Your email of yesterday did not respond to this question:
>
> "3. Have you or any executive of Dow or any member of its legal Department played any role in determining how our client's "demand letter" would be addressed by the Board and/or setting the Governance Committee's mandate with respect to it?"
> I would appreciate it if you or she would respond to this question addressed to Ms. Wilson.
>
> My questions **to you** are as follows:
>
> 1. Were you or a representative of your firm present at any portion of the April 10/11, 2013 or any earlier meeting of members of Dow's Board of Directors ("Board") or its Governance Committee on or about such dates? **To say the least, it is curious that if the Board first considered our client's Demand Letter of March 4, 2013 ("Demand Letter") on April 11, your firm's appointment as counsel to the Governance Committee on such date raises further questions.**
>
> 2. What criteria were used by the Board to determine which of its members would be appointed to address the issues raised by the Demand Letter?
>
> 3. Who participated in the determination of such criteria?

4. **Were there any factors or facts that the Board considered that might serve to disqualify any individual Dow Director from serving on the Governance Committee and/or investigating the facts and issues raised by the Demand Letter?**

5. What process did the Board utilize to select the Governance Committee as the vehicle pursuant to which the Demand Letter would be considered?

6. Did anyone investigate each or any of the members of the Governance Committee to determine whether there were any facts or circumstances which would disqualify such members from participating in the evaluation of the facts and issues raised by the Demand Letter? If so, who performed such investigation and when?

7. Which persons played a role in the selection of you and/or your firm to represent the Governance Committee?

8. When did you first learn that you and/or your firm learn that you and/or your firm were being considered to represent the Governance Committee or any of Dow's Directors in connection with the issues and facts referred to in the Demand Letter?  From whom did you learn this fact?

9. What steps were taken to insure that there were no facts or circumstances that might justify disqualification of you and/or your firm from acting as counsel to the Governance Committee?  By whom and when?

10. **Assuming your firm performed a conflict check before being considered for the retention by the Governance Committee ultimately accepted by your firm, when was such conflict check performed?**

11. Have you and/or any member of the Governance Committee made any investigation or inquiry into any of

the facts and/or circumstances referred to in the Demand Letter prior to April 11, 2013? If so, what led you or the Committee member to do so?

I would also appreciate receiving from you (a) each Board resolution delegating responsibilities to the Governance Committee as referred to above and/or appointing its members; each resolution of the Governance Committee referring to the retention of you and/or your firm by it;  (c) a copy of each written demand upon the Board referring to any of the issues/claims referred to in the Demand Letter; and (d) a copy of each complaint, whether direct or derivative, which refers to the wrongdoing alleged in the Demand Letter and/or including the concealment thereof. [emphasis added]

127.  Mr. Nachbar would not provide answers to any of the foregoing questions as communicated to Mr. Greenfield by email on May 14, 2013.  The answers to such questions would have demonstrated that the process put in motion by the Board and Defendant Kalil were for the sole purpose of developing a record (and a rejection of Plaintiff's demands) that could be used by the Defendants in arguable support for a motion to dismiss in this litigation. [17] In the same email of May 14, 2013, Mr. Nachbar said: "The Dow board, on the advice of the

---

[17] Inasmuch as Mr. Nachbar would not respond to the questions addressed to the *bona fides* of the Governance Committee and the appointment of him and his firm as the Committee's counsel, it is not clear who arranged for such appointment/retention. Upon information and belief, Defendant Kalil, who is accountable to Defendant Liveris, actively participated in such selection and may have directed it.

Governance Committee, will make a decision concerning your client's demand, and will communicate it to you.  We expect that to occur this Summer."

Mr. Greenfield responded the same day:

"I'm truly sorry that you did not see fit to respond to my questions or provide me with any of the requested documents….

Each of the questions set forth in my May 8 email goes to the legitimacy of the response of the Board to the Levine demands including what activities your firm and the members of the Governance Committee are taking as well. A failure to respond to some relatively modest questions that address post-demand conduct, at a minimum, certainly does not reflect well on whatever claim is being and will be made as to the independence of the Dow Board of Directors, the Governance Committee or your firm.

Please re-consider your response. From my client's perspective, **the information sought is critical to an assessment of how my client's demands are being addressed." [emphasis added]**

128. On May 15, 2013, Judgment was entered against Dow in the *Urethane Litigation* in the amount of $1,200,147,117 plus interest.

129. Following the entry of Judgment, Plaintiff supplemented his earlier demand letter with additional letters on May 21, 2013 and July 30, 2013 attached hereto as Exhibits "5" and "6." The latter demand letter, referring to a serious error committed by Dow's Trial Counsel, cited Judge Lungstrum's July 26, 2013 denial

of the Company's post-trial motions in the *Urethane Litigation* and stated, *inter*

*alia*,:

> The Court found in rejecting Dow's newly argued opposition to an award to the Class of damages in the aggregate:
> The Court further notes that **Dow failed to argue at trial that the jury could not find aggregate damages or that a separate trial was required for an adjudication of individual [Class] members damages'"** [emphasis added]

130.   On August 7, 2013, Ms. Wilson sent a letter to Mr. Greenfield, never

received by him, transmitting the Board's rejection of the demands set forth in

Plaintiff's March 4, 2013 Demand Letter addressed to the Company's antitrust

violations and the *Urethane Litigation.* (Exhibit "9" hereto)[18]

131.   Such letter falsely claimed that MNAT had "assisted the Governance

Committee in investigating both the factual and legal issues raised in [Plaintiff's

March 4, 2013] Demand." In fact, as she well knew, virtually the entirety of the

highly selective "investigation" was carried out by Mr. Nachbar and MNAT. Ms.

Wilson claimed that such counsel "found no evidence that any officer or director of

Dow was complicit in any of the alleged price-fixing activities." This was not

---

[18]   Ms. Wilson, a direct subordinate to Defendant Kalil, who apparently orchestrated the Board's consideration of Plaintiff's demands together with outside counsel, never explained how she became personally aware of the "thinking" and purported investigative process of the  members of the Board's Governance Committee, its deliberations and its factual and legal conclusions.

surprising since, upon information and belief, under direction from Mr. Nachbar, *inter alia,* no testimony of any witness was taken under oath and the most material of witnesses were never even interviewed. Thus, even if the Governance Committee members wanted to know what the members of the Dow Board knew and when they knew it, no testimony was taken of the non-management directors, the most critical of witnesses. By selectively evaluating testimony and documents from the *Urethane Litigation* and MNAT's "cherry picking" what facts would be provided to the Governance Committee regarding the underlying antitrust claims (including Defendant Liveris' potential complicity therein and failure of oversight with respect thereto), such Committee was not in a position to exercise its "business judgment," even if its members were sufficiently objective and capable of doing so.

Beyond the fact that the purported "investigation" was conducted with the institutional biases referred to above in favor of the Individual Defendants, it was conducted by MNAT and Mr. Nachbar with a very narrow focus aimed at the ultimate "whitewash," a recommendation to the Board that there were no valid claims that Dow could properly allege against anyone for anything. Even as to those claims the Governance Committee sidestepped (as recounted by Ms. Wilson), such as potential legal malpractice claims and those in Dow's senior management responsible for the antitrust-related claims for which Dow will have

made more than $1.2 billion in payments to resolve, she maintained that all such claims were barred by applicable statutes of limitation. She did not explain why no effort had been made to obtain agreements tolling the running of applicable statutes of limitation before such limitations periods had run.

She also reported that the Governance Committee had made a determination that because "any potential recovery would be a very small fraction of the amount at issue," and that Dow would incur legal expenses, the claims Plaintiff demanded should be pursued, the Company should not pursue them. Apparently, the Committee rationalized this conclusion without considering whether a recovery of tens of millions of dollars or more, despite being "a small fraction of the [more than $1.2 billion] at issue" would still be justifiable, especially, under then prevailing circumstances, competent counsel could be retained by Dow to pursue its claims on a totally contingent fee basis.

The Governance Committee also attempted to justify its once-and-for-all-times rejection of Plaintiff's *Urethane Litigation*-related claims with the excuse that, *inter alia,* the jury verdict was still on appeal. Neither the Governance Committee nor its counsel ever gave any consideration to the possibility that prosecution of these claims could merely be postponed (with appropriate tolling agreements negotiated, especially with Dow's Trial Counsel) until the litigation was finally resolved.

In the context of the refusal by Ms. Wilson and Mr. Nachbar to provide even the most fundamental information as to the purported *bona fides* of the process the Board set in motion to address Plaintiff's March 4, 2013 Demand Letter, their intransigence generally and the facts and circumstances set forth above (including the failure of the Governance Committee to validly exercise its "business judgment," the Board's wholesale rejection of the demands set forth therein was unreasonable.

Not having heard anything substantive from Mr. Nachbar, the Governance Committee or on behalf of the Board with respect to Plaintiff's July 30, 2013 Demand Letter, on September 27, 2013, Mr. Greenfield emailed Mr. Nachbar:

> "It has been nearly two months since I heard from you. Please provide me with an update as to what the Dow Board or its Governance Committee have done, if anything, vis-à-vis, my client's Demand Letter of July 30, 2013."

> Mr. Nachbar responded six weeks later on November 5, 2013:

> **"Your letter is scheduled to be considered by Dow's Governance Committee at its next meeting, in mid-December**." [emphasis added]

Mr. Greenfield responded the same day (Exhibit "11" hereto) and said, *inter alia*,:

> While I appreciate your informing me of the forthcoming meeting, you have yet to provide me with any facts

demonstrating the independence, disinterestedness and good faith of the members of the Governance Committee. Indeed, your firm's intransigence reflects, as well, its and your participation in a waste of Dow's assets, causing it to expend substantial resources with absolutely no benefit to the Company. If you are participating in what appears to be a likely whitewash of the members of the Dow Board and others culpable, please be advised that your firm is setting itself up to be a named defendant in a future shareholder derivative suit.

So there may be no mistake, please regard this as a formal demand upon the Dow Board of Directors that it commence suit against you and your firm arising out of your role as counsel to the Governance Committee. Indeed, to date, you have refused to establish your own disinterestedness, independence and good faith in dealing with my client's demands. I trust that you will convey this demand to the members of the Dow Board promptly and confirm such conveyance to me.

132. On November 28, 2013, a further demand letter was sent to the Company's Board (Exhibit "7" hereto) which stressed the wrongdoing of Mr. Nachbar and MNAT in wasting Dow's assets and aiding and abetting the Individual Defendants in developing and constructing a plan to avoid personal liability for their conduct:

In the case of MNAT, based on MNAT's unwillingness to respond to fundamental questions addressed to it and the Governance Committee's members as set forth in my e-mail to Mr. Nachbar of May 8, 2013, (a copy of which is attached), it is clear that they are not able to demonstrate their independence, dis-interestedness and *bona fides* with respect to my client's demands. Notwithstanding such shortcomings, MNAT continues to

> aid and abet not only the Governance Committee
> members' waste of Dow's assets but yours as well.
> Accordingly, I demand that Dow commence suit against
> MNAT to recover its damages, including all fees paid to
> MNAT, since it is performing no service of value to the
> Company."

133.   At its meeting of December 11, 2013, the Board addressed Plaintiff's

Demand Letter of July 30, 2014 and wrongfully rejected the demands therein

relating to Dow's Trial Counsel in the *Urethane Litigation*. (See letter from Ms.

Wilson dated December 20, 2013, Exhibit "10" hereto).

134.   Mr. Greenfield responded to Ms. Wilson by email dated December

26, 2013 (Exhibit "12" hereto):

> Additionally, although your letter addresses the issue of
> the statutes of limitations applicable to the lawyers who
> have represented the Company in connection with the
> Urethane Litigation, it does not address whether each of
> such law firms has been informed of the claims for the
> purposes of preserving applicable insurance coverage,
> particularly since the Company's damages are likely well
> in excess of such firm's ability to pay should the
> judgment against Dow not be overturned or materially
> reduced on appeal.
>
> Based on your letter, it appears that the Michigan and
> other states' statutes of limitation applicable to potential
> attorney malpractice claims would appear to alleviate the
> immediate concerns as expressed in my July 30, 2013
> letter to Dow's Board. However, these circumstances
> have no bearing insofar as the running of other statutes of
> limitations applicable to those present or former
> employees of Dow implicated in the underlying
> wrongdoing in the trial of the Urethane Litigation. As to

such employees, have you or anyone else in Dow's Legal Department and/or management sought and obtained agreements tolling all applicable statutes of limitation from such employees with respect to claims Dow may have against any of them? If this has not occurred, without regard to whether Dow regards such employees as culpable, will Dow do so?

135.   Following the unanimous affirmance of the Judgment in the *Urethane Litigation* by the 10th Circuit Court of Appeals, on September 29, 2014, Plaintiff sent a further demand letter to the Dow Board (Exhibit "8" hereto) which was followed up by a December 1, 2014 letter (emailed by him on December 2, 2014) (Exhibit "14 hereto from Mr. Nachbar. No reference was made therein as to any investigation by the Governance Committee having taken place, let alone the long-delayed "final decision" of the Board and suggesting that such a decision would be delayed at least until the "exhaustion of Dow's appeals" in the *Urethane Litigation*. Mr. Nachbar alleged that pursuit of any claims by Dow would be "counterproductive and harmful" to it and that if the judgment in the *Urethane Litigation* were to remain in effect following exhaustion of all of Dow's appeals, the Company would then (and only then) consider Plaintiff's demands on their merits. Mr. Nachbar's then-stated position reflected a *de facto* reversal of the Governance Committee's (i.e. his) earlier position that no Urethane Litigation-related clams should **ever** be pursued by Dow.

136.    Evidencing the fact that Ms. Wilson's letter to him of August 7, 2013 had never been received, Mr. Greenfield wrote back and said:

> Please advise me whether the Board, any committee of it and/or your firm has even begun an investigation of the claims set forth in my client's [March 4, 2013] Demand Letter and/or whether any documents have been collected in connection with it.

> Mr. Nachbar never responded.

137.    Following the commencement of the *Wood Litigation*, the decision by the Court denying defendants' motion to dismiss and the settlement thereof, on October 31, 2015, Plaintiff sent to the Dow Board (the "Liveris Demand Letter", Exhibit "3" hereto) which focused on Defendant Liveris' misuse of Dow's assets and the acquiescence of the Board and Senior Financial Officer Defendants in connection therewith. After more than three months and despite a substantial record having been compiled in connection with the ongoing investigation of the claims alleged by Plaintiff therein, on February 6, 2016, counsel for the Board finally e-mailed Mr. Greenfield with respect to the Liveris Demand Letter:

> "At its meetings last week, the Board of Directors agreed that the Governance Committee would act as a demand committee for purposes of addressing your client's demand.  We will be in touch when we learn the identity of the lawyer that the Governance Committee has chosen to act on its behalf."

138.   As of the date of this Complaint, more than six months have elapsed following the Liveris Demand Letter and despite the SEC investigation, Plaintiff has yet to hear from Mr. Nachbar or anyone representing the Board's Governance Committee. Based in part upon the Governance Committee and its presently unidentified counsel having a massive evidentiary record available to them, if an investigation of the claims alleged in the Liveris Demand Letter had been undertaken in good faith, such purported investigation should have long been completed before this date.

Given the passage of so much time, the already extant record of Defendant Liveris' personal misuse of Dow's assets and the sham nature of the Governance Committee's prior "investigations" of Plaintiff's Demand Letters, Plaintiff regards the demands set forth in the Liveris Demand Letter as having been constructively rejected and rejected wrongfully.

## The Board's Responses to Plaintiff's Demands Were in Bad Faith and Not a Valid Exercise of its Business Judgment

139.   From the very first of the Board's responses to Plaintiff's pre-suit demands, a process was put in place, presumably engineered and orchestrated by Defendant Kalil and counsel for the Board, to reject those demands and to employ such rejections as a foundation for an eventual motion to dismiss this litigation.

140.   Upon information and belief, although, according to the April 22, 2013 letter from Ms. Wilson, the Board assigned to "**the Governance Committee**

**of the Board, or any other action the responsibility to consider the facts and circumstances surrounding the Demand Letter**," its members almost totally abdicated their responsibilities and left the investigation of Plaintiff's claims solely in the hands of Mr. Nachbar and MNAT. In turn, such counsel did not even even investigate Plaintiff's claims in an objective and competent manner by, *inter alia,* not taking and preserving testimony from the most material of witnesses including members of Dow's Board to determine **what they knew and when they knew it** with regard to the underlying wrongdoing as alleged by Plaintiff. Moreover, neither Mr. Nachbar, Ms. Wilson nor anyone else purportedly speaking on behalf of Dow has ever proferred any information that would demonstrate that the Board or the Governance Committee was seriously considering whether Dow would ever pursue any of its claims against the Individual Defendants or others as identified by Plaintiff in his Demand Letters. Thus, this fact and their unjustifiable conclusions reflect an absence of a legitimate exercise of "business judgment" by the Governance Committee or the full Board, which "rubber stamped" its recommendations.

141.   Integral to the strategy of Defendant Kalil and counsel to the Board in their attempt to assist the defendants in connection with their forthcoming motion to dismiss was, *inter alia,*: (a) the retention of Mr. Nachbar and MNAT to represent the Governance Committee with their lack of objectivity and

independence as well as their long-held bias in favor of boards of directors and managements vis-à-vis shareholder interests;[19] (b) the denial to Plaintiff's counsel the opportunity to address personally the Board and/or the Governance Committee with regard to Plaintiff's demands; and (c) intentionally delaying taking testimony of material witnesses such as employees of Dow, while their memories were better than they would be today.

142.   In the wake of the wrongdoing of the Individual Defendants and their subordinates, and the constructive and, *de facto,* wrongful rejection and/or wrongful rejection of Plaintiff's pre-suit demands, he has commenced this litigation to recover Dow's damages and to seek other non-monetary relief.

### Plaintiff Never Conceded that the Board was Independent for all Purposes

143.   In making the demands set forth in the Demand Letters attached hereto, Plaintiff was in no way conceding the disinterestedness or independence of any of the Dow directors for all purposes, without time limitation and notwithstanding their subsequent conduct.   Rather, the pre-suit demands were made to give the Board the opportunity to cause the Company to assert its claims directly, in the first instance, which claims Plaintiff now asserts derivatively.

---

[19] As pointed out above, Mr. Nachbar and MNAT have previously represented Dow and presumably were retained by Defendant Kalil.

144.  In his March 4, 2013 Demand Letter, Plaintiff stated:

> This letter is being sent solely for the purpose of giving
> Dow the opportunity to commence the demanded
> litigation itself in the first instance and to do so promptly.
> Each of you is personally implicated in the alleged
> wrongdoing by, inter alia, your acquiescence in the
> wrongdoing alleged above and/or its cover-up, which is
> ongoing.  The demands set forth in this letter have been
> made because, if they had not been, your counsel and/or
> counsel for the Company would seek to have dismissed
> any shareholder's derivative litigation that might be
> commenced in connection with the claims referred to
> herein had no pre-suit demand been made."

145.  The members of Dow's Board are each personally exposed to potential liability for the wrongdoing alleged herein and have not and could not have acted (as they did not) independently, disinterestedly or in solely the best interests of the Company in the context of evaluating Plaintiff's Demand Letters.

146.  The members of Dow's Board have benefited from the wrongdoing alleged herein, and have engaged in conduct to preserve their positions of control and the perquisites derived therefrom and to protect themselves from personal liability for their acts of mismanagement and breaches of fiduciary duties. In their own self-interest and out of loyalty to Defendant Liveris, even if they arguably displayed some initial degree of independence in first considering Plaintiff's Demand Letters, by their subsequent conduct and the conduct of the members of the Governance Committee, they demonstrated their biases, lack of independence and expectation that such demands would be rejected.

147. Moreover, in light of the Board members' personal culpability and responsibility for the wrongful acts described herein, they are not disinterested with respect to responding to Plaintiff's Demand Letters.

## DAMAGES SUFFERED BY DOW

148. The Board and senior management of Dow, including Defendant Liveris, in particular, failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary and other duties owed by them to Dow and its shareholders.

149. Dow's Directors utterly failed to implement validly functioning reporting and controls to prevent Dow's serious and ongoing violations of antitrust and trade regulation laws, rules and regulations. Thereafter, Dow's Directors approved or acquiesced in a cover-up of the wrongdoing and an ill-considered defense of such claims in the *Urethane Litigation*, as well as failed to properly disclose and account for potential liability in connection with those proceedings. Further, Dow's Board has failed to properly investigate and preserve (by way of tolling agreements or otherwise) claims against other potentially responsible persons, including but not limited to its outside auditor and Dow's Trial Counsel, and utterly failed to take steps to make fundamental and meaningful changes in the Company's culture and corporate governance consistent with the fiduciary duties of the members of Dow's Board.

150.   As a result of the Individual Defendants' breaches of their fiduciary duties as described herein, a judgment against Dow has been entered in excess of $1.2 billion in connection with the *Urethane Litigation*, now settled for $835 million for the members of the Class therein plus approximately an additional $450 million paid to those who excluded themselves from the Class. Moreover, if the Board does not put into place stringent antitrust compliance procedures and implement them, Dow will continue to be exposed to substantial injury to its reputation and corporate goodwill, as well as possible governmental investigations and enforcement actions, potential criminal and civil liability, including litigation.

151.   The Company also has been caused to expend tens of millions of dollars in the defense of the *Urethane Litigation*, which case should never have proceeded to trial.  Tellingly, Dow was *the only* named Defendant to take the case to trial.  As a direct consequence, Dow has incurred and will continue to incur substantial costs of defending against such litigation and ultimately resolving the claims with shareholder funds, despite the fact that the underlying wrongdoing was and is the responsibility of the Individual Defendants  named herein who held their respective positions during the periods of the wrongdoing alleged herein.

152.   Dow has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination specifically because a full and public accounting has never been made of Defendant Liveris' misuse of Dow's assets and

because the Individual Defendants have not disclosed publicly the Company's potential liability for antitrust law violations beyond those now known in the *Urethane Litigation* (i.e. more than $1.2 billion plus the massive litigation expenses incurred).

153.   Because the members of the Company's Board suffer massive conflicts of interest due to their own personal culpability and their loyalty to Defendant Liveris, they are not capable of advancing solely the Company's interests as compared to their own or validly exercising independent "business judgment" with respect to the wrongdoing alleged in Plaintiff's Demand Letters. Indeed, these conflicting interests the defense of the litigation, which will not be evaluated in Dow's sole interests to the exclusion of all others.

154.   Based upon the facts and circumstances described herein, it is clear that the members of Dow's Governance Committee and full Board have not dealt with and are not dealing with Plaintiff's claims objectively, independently, and solely in the Company's best interests.

155.   As a result of the misconduct alleged herein, Dow has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image, reputation and goodwill. Should the Company's interests continue to be represented as they are at present, Dow will be irreparably harmed.

## COUNT I

### (Breach of Fiduciary Duty and Waste of Corporate Assets)

156.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

157.   The Individual Defendants all owed and/or owe fiduciary duties to the Company and its shareholders to exercise candor, good faith and loyalty.  By reason of their fiduciary relationships with the Company and its shareholders, the Individual Defendants specifically owed and owe Dow the highest obligation of good faith and loyalty in the management and administration of the affairs of the Company, including the oversight of Dow's compliance with federal and state antitrust and trade laws and regulations, avoidance of conflicting loyalties and business relationships and compliance with Dow's codes of conduct and tenets of corporate governance.

158.   Each member of the Board had and has specific fiduciary duties as defined by the Company's key corporate governance documents and principles. As set forth above,  had those duties been discharged in accordance with the Board's obligation pursuant thereto,  the misconduct and consequent harm to the Company as described above would have been avoided and/or uncovered and corrected.

159.   In bad faith, the Individual Defendants consciously violated their corporate responsibilities and intentionally breached their fiduciary duties to protect the rights and interests of Dow and its shareholders.

160.   As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, they have caused the Company substantial damages arising therefrom and causing the waste of valuable corporate assets.

161. As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount that cannot presently be determined.

## COUNT II

### (Unjust Enrichment)

162.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

163. Each of the Individual Defendants was and is being unjustly compensated by Dow with compensation packages and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein. This is particularly so as to Defendant Liveris who has personally been enriched unjustly as referred to above.

164.   Each of the Individual Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should be required to account for and repay the Company therefor together with their earnings thereupon.

## COUNT III

### (Breach of Duty of Loyalty)

165.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

166.   The conduct of Defendants has exposed Dow to significant damages due to the members of the Board having first put their personal or contractual loyalties to Defendant Liveris before their obligations to put the Company's interests first and foremost.

167.   By reason of the foregoing, Defendants have caused the Company to suffer substantial harm.

## COUNT IV

### (Breach of Duty of Candor)

168.   Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

169.   The Individual Defendants, during their respective tenures with the Company, repeatedly concealed Dow's violations of the antitrust laws and risk of a

massive liability verdict in the *Urethane Litigation* as well the extent of Defendant Liveris' misuse of the Company's assets.

170.   Such concealment of material facts from Dow's shareholders and the public at large was a breach of the Individual Defendants' duty of candor owed to Dow and its shareholders which, ultimately has caused substantial damages to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Against all Individual Defendants and in favor of Dow for the amount of damages sustained by the Company as a result of such Defendants' breaches of fiduciary duties;

B.   Declaring that the Individual Defendants have breached their fiduciary duties owed to Dow and wasted its assets, as alleged herein, causing substantial damages to Dow;

C.   Requiring the Individual Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

D.   Requiring the Individual Defendants to account for and repay the Company to the extent they have been unjustly enriched by their wrongful conduct, as described herein, together with their earnings upon such amounts;

E.      Ordering the Director Defendants to cause the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

F.      Awarding Dow restitution from the Individual Defendants;

G.      Determining and awarding to Dow exemplary damages in an amount necessary to punish the Individual Defendants;

H.      Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

I.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

**PITT, McGEHEE, PALMER, & RIVERS, P.C.**

By:    /s/ *Jennifer L. Lord (P46912)*_____
Michael L. Pitt (P24429)
Jennifer L. Lord (P46912)
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
Tel: (248) 398-9800
Fax: (248) 398-9804
mpitt@pittlawpc.com
jlord@pittlawpc.com
and


GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
Marguerite R. Goodman
Ann M. Caldwell
Ilene F. Brookler
250 Hudson Street-8th Floor
New York, NY 10013
917-495-4446
whitehatrdg@earthlink.net

Counsel for Plaintiff

May 31, 2016